Richard LEE, Donovan Byfield, Plaintiffs,

v.

ABC CARPET & HOME, Jerry Winrib, and Paul Chapman Defendants.

No. 00 Civ. 0984(DAB).

United States District Court, S.D. New York.

Feb. 26, 2002.

448

The Jacob D. Fuchsberg Law Firm, LLP, Alan L. Fuchsberg, New York City, for Plaintiff.

Orrick Herrington & Sutcliffe, LLP, Ira G. Rosenstein, New York City, for Defendants.

## OPINION

BATTS, District Judge.

Richard Lee, ("Plaintiff"),[1] claims that he is entitled to back wages from ABC Carpet & Home, Jerry Weinrib and Paul Chapman, (collectively "Defendants"), pursuant to the Fair Labor Standards Act, ("FLSA") 29 U.S.C. § 216(b) and the New York Labor Law, and liquidated damages pursuant to 29 U.S.C. § 201 *et seq.*[2] Defendants argue that Plaintiff was not an "employee" within the meaning of the FLSA and move for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons stated below, the Defendants' motion is DENIED.

## I. BACKGROUND

Defendant ABC Carpet and Home, ("ABC"), is a corporation which sells a variety of home furnishings, including rugs and carpets, through its retail stores. (Pl.'s 56.1 Stmt. ¶ 1; Defs.' 56.1 Stmt. ¶ 1, Fuchsberg Decl. ¶ 8, Ex. E.) Defendant Jerry Weinrib ("Weinrib") is the Chairman of the Board and the owner of ABC. (Pl.'s 56.1 Stmt. ¶ 2; Defs.' 56.1 Stmt. ¶ 2.) Defendant Paul Chapman, ("Chapman"), is the President of ABC's so-called "broadloom" operation, which includes services related to wall-to-wall carpeting. (Pl.'s 56.1 Stmt. ¶ 3; Defs.' 56.1 Stmt. ¶ 3; Fuchsberg Decl., Ex. E.)

Plaintiff Richard Lee, was employed at Defendant ABC as a "carpet installation mechanic", for approximately eight years, from 1991 to 1999. (Pl.'s 56.1 Stmt. ¶ 72.) Plaintiff contends that he worked exclusively for ABC during this time period. (Pl.'s 56.1 Stmt. ¶ 38.)

### 1. Carpet Installation Mechanics

Customers who purchase carpet at ABC have the option of allowing ABC to install the carpet for them. (Pl.'s 56.1 Stmt. ¶ 4; Defs.' 56.1 Stmt. ¶ 4.) Only customers who purchase their carpets at ABC have this option; that is, ABC does not independently engage in the business of carpet installation. (Pl.'s 56.1 Stmt. ¶ 5; Defs.' 56.1 Stmt. ¶ 5.) Defendants assert that ABC's profit on carpet installation is not a significant part of ABC's overall profit. (Defs.' 56.1 Stmt. ¶ 9.) Plaintiff, however, disputes this point and argues that the profit on carpet installation makes up a considerable portion of ABC's overall profit. (Pl.'s 56.1 Stmt. ¶ 9.)

ABC maintains a list of carpet installation mechanics who are available to install carpet on the customer's premises. (Pl.'s 56.1 Stmt. ¶ 13; Defs.' 56.1 Stmt. ¶ 13.) Defendants explain that the list consists of carpet installation mechanics and companies who have "contracts" with ABC. (Defs.' 56.1 Stmt. ¶ 14.) ABC's "labor managers" decide which carpet mechanic should be assigned to a particular job. (Chapman Tr. Dep. 136: 12–16.) Defendant ABC asserts that they consider these individual mechanics and companies to be "independent contractors." (Defs.' 56.1

---

**1.** At an earlier stage of this proceeding, Plaintiff Byfield's Attorneys moved to withdraw as counsel to Donovan Byfield because Byfield had become a fugitive from justice and contact with their client had ceased. On October 17, 2000, this Court denied that request. However, Plaintiff Donovan Byfield continues to be a fugitive from justice and as such, has

defaulted on discovery. On the consent of Parties and in the interest of justice, it is appropriate at this stage of the proceedings to dismiss Byfield's individual claim.

**2.** Plaintiff voluntarily withdraws the conversion claims. *See* Pl. Mem. Law at 23.

Stmt. ¶ 16.) As such, according to ABC, the mechanics are not eligible for employment benefits, they do not receive paid time off, there is no policy for vacation or personal time, employment taxes are not withheld and ABC issues 1099 forms to the mechanics rather than W–2 forms. (Defs.' 56.1 Stmt. ¶¶ 17–21.)

The carpet mechanics are not on ABC's payroll. (Pl.'s 56.1 Stmt. ¶ 12; Defs.' 56.1 Stmt. ¶ 12.) Plaintiff admits that he believed he was an independent contractor for ABC; however, Plaintiff claims that he did so not knowing there was a potential legal issue about his employment status. (Pl.'s 56.1 Stmt ¶ 77.) Furthermore, Chapman never consulted with the carpet mechanics or anyone at ABC to determine whether the carpet mechanics should be characterized as employees or independent contractors. (Chapman Tr. Dep. 81: 6–25, 82: 2–8.) Moreover, Plaintiff identified himself as self-employed on his tax returns from 1991 to 1999, although again, he now asserts that he was not aware that there was a potential legal issue about his employment status. (Pl.'s 56.1 Stmt. ¶ 80.) Finally, Plaintiff asserts that the carpet installers receive paychecks and earning statements on a weekly basis. (Pl.'s 56.1 Stmt. ¶ 12.)

### 2. *Escrow Accounts*

A percentage of each paycheck is deposited into an escrow account maintained by ABC for the mechanics. (Pl.'s 56.1. Stmt. ¶¶ 33, 34; Defs.' 56.1 Stmt. ¶¶ 33, 34.) There is a dispute as to whether the mechanics themselves have total "discretion" in handling these accounts. (Pl.'s 56.1 Stmt. ¶ 35; Defs.' 56.1 Stmt. ¶ 35.) ABC withdraws money from the escrow accounts to pay for insurance premiums for some of the mechanics. (Pl.'s 56.1 Stmt.

¶ 36; Defs.' 56.1 Stmt. ¶ 36.) Additionally, Defendants use the money in the escrow accounts to reimburse themselves if they have to perform a repair on the mechanic's work. (Pl.'s 56.1 Stmt. ¶ 34; Defs.' 56.1 Stmt. ¶ 34.) Defendants maintain that the carpet mechanics are free to submit requests to withdraw "personal loans" from the accounts. (Chapman Tr. Dep. 112: 21–27; Rosenstein Decl. ¶ 7, Ex. 6.) However, these requests are subject to approval by the labor managers. (Rosenstein Decl. ¶ 7, Ex. 6.)

### 3. *Use of Assistants*

The mechanics hire helpers to assist them on the job. (Pl.'s 56.1 Stmt. ¶ 47; Defs.' 56.1 Stmt. ¶ 47.) Plaintiff states that with the assistance of the helpers, the assignments are completed in a shorter period of time. (Pl.'s 56.1 Stmt. ¶ 51; Defs.' 56.1 Stmt. ¶ 51.) Plaintiff adds that almost every job requires the use of a helper. (Pl.'s 56.1 Stmt. ¶ 52.)

Defendant ABC asserts that the mechanics are free to hire their own helpers at their own discretion and that they are responsible for hiring, training and paying[3] these helpers. (Defs.' 56.1 Stmt. ¶¶ 51, 60.) However, Plaintiff argues that while he did not have to get ABC's approval for the helpers (Lee Dep. at 134), ABC "prefers to meet" the prospective helpers. (Pl.'s 56.1 Stmt. ¶ 60.)

### 4. *Hiring and Supervision*

Chapman interviews the mechanics before they are sent out on their first job. (Pl.'s 56.1 Stmt. ¶ 23; Defs.' 56.1 Stmt. ¶ 23.) Chapman offers the mechanics a rate-per-yard, at which they will be paid by ABC for each job. (Pl.'s 56.1 Stmt. ¶ 24; Defs.' 56.1 Stmt. ¶ 24.) There is a dispute as to whether the rate can be

---

**3.** Lee states that he usually paid his helpers a third of his payment from ABC. (Lee Dep. at 52.)

negotiated over time. (Pl.'s 56.1 Stmt. ¶ 25; Defs.' 56.1 Stmt. ¶ 25.) Plaintiff is an experienced carpet installer and it was not necessary for ABC to train him. (Pl.'s 56.1 Stmt. ¶ 83; Defs.' 56.1 Stmt. ¶ 83.) However, Plaintiff asserts that there was a certain method that Chapman wanted the mechanics to follow. (Pl.'s 56.1 Stmt. ¶ 85.) Additionally, Plaintiff contends that although there is no single ABC staff person assigned to oversee the mechanics' work, there are a number of ABC employees who are responsible for contacting the customer, sending invoices to the customer, contacting the mechanics and reviewing the mechanics' weekly worksheets. (Pl.'s 56.1 Stmt. ¶ 54.)

Defendants claim that the mechanics' income is not dependent on how many days they work per week. (Defs.' 56.1 Stmt. ¶ 29.) However, Plaintiff avers that even though he is paid per-square-yard, the jobs vary in size and his income depends on how many jobs he can do in one day. (Pl.'s 56.1 Stmt. ¶ 29.)[4] ABC contends that the mechanics are referred to jobs based on availability and the mechanic's willingness to work. (Defs.' 56.1 Stmt. ¶ 37.) Plaintiff, however, asserts that work is routinely available, and mechanics who decline to undertake certain assignments are not given referrals as frequently. (Pl.'s 56.1 Stmt. ¶ 37.)

Defendants claim that the carpet mechanics submit invoices to ABC for the work they have completed each week. (Defs.' 56.1 Stmt. ¶ 30.) Defendants maintain that the mechanics do not provide them with any additional information other than the invoices. (Defs.' 56.1 Stmt. ¶ 32.)

Plaintiff disputes the use of the term "invoice", asserting instead that weekly worksheets (Fuchsberg Decl., Ex. F.) are submitted, for which the pay rate is fixed and all additional costs are subject to Defendant ABC's approval. (Pl.'s 56.1 Stmt. ¶ 30.) Additionally, there is a dispute as to whether Plaintiff had to call ABC each day for assignments. (Pl.'s 56.1 Stmt. ¶ 40; Defs.' 56.1 Stmt. ¶ 40.) In particular, Plaintiff claims that mechanics report in from the job site and call in on a daily basis to inform ABC of their progress and to receive the next day's assignment. (Pl.'s 56.1 Stmt. ¶ 32.) Furthermore, Plaintiff claims that the mechanics are required to call each day for assignments unless they have received permission in advance to take time off. (Pl.'s 56.1 Stmt. ¶ 38.) Finally, Plaintiff asserts that ABC arranges the day and time for installation with the customer and therefore has access to the mechanics' individual schedules. (Pl.'s 56.1 Stmt. ¶ 55.)

Plaintiff states that while he is not guaranteed a certain number of jobs every day, many of the dependable mechanics are given assignments daily. (Pl.'s 56.1 Stmt. ¶ 41; Defs.' 56.1 Stmt. ¶ 41.) There is a dispute as to whether the mechanics can choose the type of work they would like to do and whether they can refuse to do a certain job if they are adverse to the particular assignment. (Pl.'s 56.1 Stmt. ¶¶ 42, 43, 59; Defs.' 56.1 Stmt. ¶¶ 42, 43, 59.) Plaintiff also asserts that he was restricted from working as a carpet installation mechanic for other companies during the time he worked for ABC. (Pl.'s 56.1 Stmt. ¶ 45; Pl. Dep. at 145.[5]) Defendants, on the oth-

4. ABC states that Plaintiff only worked 3.5 days per week. (Defs.' 56.1 Stmt. ¶ 97.) However, the record reveals that Plaintiff often worked from 10:30 a.m. until 9:00 or 10:00 at night more than once a week. (Lee Dep. 129: 11–20, 81: 19–25.) Additionally, on occasion, Plaintiff worked on a Saturday or Sunday in order to get a job finished that he was assigned on a Friday. (Lee Dep. 86: 24–25, 87: 2–23.) Nevertheless, according to Plaintiff, the job would be listed on the ABC invoice for Friday only. (Lee Dep. 87: 7–10.)

5. Lee states: "You [carpet mechanics] are actually committed to them. There is no

er hand, argue that the carpet installation mechanics were never limited in this way and that the mechanics were always free to work with other companies. (Defs.' 56.1 Stmt. ¶ 45.)

### 5. *Uniforms and Business Cards*

ABC offers the mechanics uniforms; however, the mechanics are not required to wear them and are not penalized for failure to wear the uniform. (Pl.'s 56.1 Stmt. ¶¶ 64, 65, 107; Defs.' 56.1 Stmt. ¶¶ 64, 65, 107.) Additionally, the mechanics are given ABC business cards to leave at the customer's premises. (Pl.'s 56.1 Stmt. ¶ 66; Defs.' 56.1. Stmt. ¶ 66.) ABC requests that the mechanics write their name on the ABC business cards so that the customers have access to ABC's contact information and know the mechanic's information as well. (Pl.'s 56.1 Stmt. ¶ 66; Defs.' 56.1 Stmt. ¶ 66.) This business card is the only form of identification that ABC requires the mechanics to carry. (Pl.'s 56.1 Stmt. ¶ 68; Defs.' 56.1 Stmt. ¶ 68.)

In or about October 1999, Plaintiff ceased to call ABC for assignments and subsequently terminated his relationship with Defendants.[6] (Pl.'s 56.1 Stmt. ¶ 116; Defs.' 56.1 Stmt. ¶ 116.)

## II. DISCUSSION

### A. Standard for Summary Judgment

The principles applicable to summary judgment are familiar and well-settled. Summary judgment may be granted only when there is no genuine issue of material fact remaining for trial, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

To defeat the summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Instead, the nonmovant must "come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely ... on the basis of conjecture or surmise." *Trans Sport, Inc. v. Starter Sportswear, Inc.*, 964 F.2d 186, 188 (2d Cir.1992) (quoting *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.1991)).

As a general rule, all ambiguities and all inferences drawn from the underlying facts must be resolved in favor of the party contesting the motion, and all uncertainty as to the existence of a genuine issue for trial must be resolved against the moving party. *LaFond v. General Physics Servs. Corp.*, 50 F.3d 165, 171 (2d Cir.1995). As is often stated, "[v]iewing the evidence produced in the light most favorable to the nonmovant, if a rationale trier could not

---

signed paper saying that you're committed. But verbally, they're telling you this. And if you don't—if they find out that you're working for other people, there are ways of making you pay, which is --- you won't get any work. That's a known fact." (Pl. Dep. at 145.)

**6.** Specifically, in or about September 1999, (Lee Tr. Dep: 25: 2–8), Plaintiff was involved in an altercation with an ABC employee. (Pl.'s 56.1 Stmt. ¶ 112; Defs.' 56.1 Stmt. ¶ 112.) Plaintiff's dissatisfaction at Chapman's response to the incident caused him to quit working for ABC. (Pl.'s 56.1 Stmt. ¶¶ 113, 115; Defs.' 56.1 Stmt. ¶¶ 113, 115.)

find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. LILC,* 933 F.2d 187, 191 (2d Cir.1991).

### B. Definition of "Employee" Under the FLSA

■ Plaintiff contends that he is an "employee" under the FLSA and therefore has standing to bring these claims against Defendants. (Pl.'s Mem. Law at 4.) Defendants argue that Plaintiff is an "independent contractor," not an "employee," and consequently cannot bring suit under the FLSA. (Defs.' Mem. Law at 2.)

■ The FLSA was created to "eliminate low wages and long hours" as well as to "free commerce from the interferences arising from production of goods under conditions that were detrimental to the health and well-being of workers." *McGuiggan v. CPC Int'l, Inc.,* 84 F.Supp.2d 470, 478 (S.D.N.Y.2000) (citing 29 U.S.C. § 203(e), (g)).[7] The FLSA regulates minimum and overtime wages paid by employers who engage in interstate commerce. *Liu v. Donna Karan Int'l, Inc.,* No. 00 Civ. 4221, 2001 WL 8595, at *1 (S.D.N.Y. Jan. 2, 2001).

An "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee." 29 U.S.C. § 203(d). There is no definition of "independent contractor" in the statute. Rather unhelpfully, the FLSA defines "employee" as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). To "employ" means, "to suffer or permit to work." 29 U.S.C. § 203(g). The definition is a broad one, in order to facilitate the "remedial purpose of the Act." *Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1058 (2d Cir.1988) (citing *United States v. Ro-*

*senwasser,* 323 U.S. 360, 363, 65 S.Ct. 295, 89 L.Ed. 301 (1945)). As such, contrary to Defendants' contention, the Supreme Court does not condone the application of the more restrictive agency law concepts in order to assess whether a worker is an employee under the FLSA or an independent contractor falling outside the ambit of the FLSA. *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 729, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) (quoting *Walling v. Portland Terminal Co.,* 330 U.S. 148, 67 S.Ct. 639, 91 L.Ed. 809 (1947)) (finding the FLSA "contains its own definitions, comprehensive enough to require its application to many persons and working relationships"); *Frankel v. Bally, Inc.,* 987 F.2d 86 (2d Cir.1993) (holding that the common law agency test is too restrictive); *McGuiggan,* 84 F.Supp.2d at 479 (citing *N.L.R.B. v. Hearst,* 322 U.S. 111, 64 S.Ct. 851, 88 L.Ed. 1170 (1944)) (suggesting that courts "look beyond the common law" when interpreting the FLSA)

. [4, 5] There are five factors to consider when determining whether a plaintiff is an independent contractor or an employee under the FLSA. These factors, derived from *United States v. Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947), constitute what is commonly referred to as the "Economic Reality Test." Under the Economic Reality Test, a court should examine: 1) the degree of control exercised by the employer over the workers; 2) the workers' opportunity for profit or loss and their investment in the business; 3) the degree of skill and independent initiative required to perform the work; 4) the permanence or duration of the working relationship; and 5) the extent to which the work is an integral part of the employer's business. *Silk,* 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed.

---

**7.** All of the exemptions to the FLSA are listed in 29 U.S.C. § 213 (1982). None of the exemptions apply to Plaintiff.

**454**

1757 (1947); *see also Superior Care*, 840 F.2d at 1058.[8] A "mechanical application" of the test is not recommended; rather the test is based on "the totality of the circumstances" in which no single factor "is dispositive." *Superior Care*, 840 F.2d at 1058–59.

The test seeks "to ensure labor law protection is extended to all workers who are economically dependent on their employers by affording them protection as 'employees,' regardless of how their employers choose to define their status." *McGuiggan*, 84 F.Supp.2d at 479; *see also Superior Care*, 840 F.2d at 1059 (2d Cir. 1988) (finding that "an employer's self-serving label of workers as independent contractors is not controlling.")[9] Simply put, the primary purpose of this test is to determine whether, "as a matter of economic reality, the workers depend upon someone else's business for the opportunity to render service or are in business for themselves." *Superior Care*, 840 F.2d at 1058–59.

### 1. *Defendants' degree of control*

As explained by the Second Circuit in *Superior Care*, an employer does not need to supervise or monitor the employees on a daily basis in order to exercise "control" as understood by the FLSA. *Superior Care*, 840 F.2d at 1060 (finding nursing service which dictated the nurses' hourly wage and consistently reviewed their patient care notes to be an employee under the FLSA); *see also, Herman*, 172 F.3d 132 (2d Cir.1999) (exercising supervision over employees' work schedule and the conditions of their employment); *Thomas v. City of Hudson*, No. 95–CV–0070, 1996 WL 280828, at *6, (N.D.N.Y. May 20, 1996) (finding employer status of police department where police dog handlers were given specific instructions, special vehicles, and were called upon to work during off-duty hours). *Cf. Eisenberg v. Advance Relocation and Storage, Inc.*, 237 F.3d 111, 118 (2d Cir.2000) (finding an exercise of "control" for the purposes of Title VII, where defendant dictated the way plaintiff should complete her tasks, specifically by giving plaintiff "orders on a daily basis" and by directing the crew on the job site).

In the instant matter, according to Chapman, since there are numerous carpet mechanics who are assigned to a wide variety of jobs, it is not possible for him to oversee or supervise personally each and every job. Chapman Dep. 29: 21–24, 77: 12–25, 78: 2–4. However, ABC does send

---

8. There is another version of the Economic Reality Test which consists of four factors and focuses on the defendants' ability directly to control the plaintiffs' working condition. *See Carter v. Dutchess Community College*, 735 F.2d 8 (2d Cir.1984); *see e.g., Lopez v. Silverman*, 14 F.Supp.2d 405, 415 (S.D.N.Y.1998) (discussing differences between two tests). Most recently, the Second Circuit invoked the *Carter* test, but in a case whose facts differ significantly from those in the instant case; *Herman* dealt with the question of whether the status of an employer under the FLSA could be attributed to a corporation's chairman of the board, who held 50% ownership share in the company. *See Herman v. RSR Security Services Ltd.*, 172 F.3d 132 (2d Cir. 1999). Moreover, *Herman* reiterates the flexible inquiry of *Superior Care*, stating that none

of the factors examined standing alone are dispositive and that the " 'economic reality' test is determined based upon all the circumstances, any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." *Id.* As such, the more expansive five factor test set forth in *Superior Care* is "most relevant for determining whether workers are independent contractors or employees," *Lopez*, 14 F.Supp.2d at 415, and is the test most appropriate for the instant case.

9. Accordingly, since the label "independent contractor" appears to have been unilaterally provided by Chapman it does not weigh in favor of independent contractor status. (Chapman Tr. Dep. 81: 6–25, 82: 2–8.)

their estimator to the customer's premises to detail the job for the mechanic. *See* Chapman Dep. 28: 2–19. Any complaints or requests for modifications or repairs by the customer must be related by the mechanic to ABC. *See* Lee Decl. ¶ 6. Lee asserts that on occasion, Chapman makes the determination as to whether the mechanic needs assistance unilaterally, and will send another mechanic without asking the original mechanic.[10] *See* Lee Dep. 134: 2–7.

Chapman contends that the mechanics are free to negotiate the rate-per-yard. *See* Chapman Dep. 90: 13–23. Plaintiff, however, asserts that the reason why the rate differs between mechanics is not based on any particular standard. *See* Lee Dep. 184: 2–10. According to Plaintiff, the rate is different "based on how long you have been working there and who you are ... Maybe Mr. Chapman likes you, maybe he don't like you." Lee Dep. 184: 2–10. When Plaintiff first started receiving assignments from ABC he earned two dollars and fifty cents a yard. *See* Lee Dep. 73: 8–12. At the time Plaintiff terminated his relationship with Defendants, nearly eight years later, he was earning approximately three dollars and seventy-five cents a yard. *See* Lee Dep. 19–22. Currently, the mechanics are paid anywhere from three dollars to four dollars and fifty cents a yard. *See* Chapman Dep. 125: 12–13.[11]

Plaintiff asserts that three different ABC employees (all labor managers), in-

formed him that he was not permitted to work for any other carpet installation company while working for ABC. *See* Pl.'s 56.1 Stmt. ¶ 45; Lee Dep. 136: 23–25, 137: 2–18.[12] Additionally, the labor managers informed Plaintiff that when approached by a customer on a job, the carpet mechanics should inform the customer that they are ABC employees, not independent contractors. *See* Lee Tr. Dep. 137: 22–25, 197: 11–25, 198: 2–7. Finally, the labor managers told Plaintiff that the carpet mechanics were not permitted to accept jobs from the customers aside from the work they were assigned to complete for ABC. *See* Lee Tr. Dep. 138: 2–5, 139: 2–22. Defendants dispute these assertions.

Based upon this record, the Court finds that there exist controverted material facts regarding whether Defendants exercised "control" over the mechanics in a manner contemplated by the FLSA.

### 2. *Opportunity for profit or loss*

When determining whether the carpet mechanics have an opportunity for profit or loss, the Court should consider whether the carpet mechanics "invested significantly more of their own money" when installing carpets for Defendant ABC. *Thomas,* No. 95–CV–0070, 1996 WL 280828, at *8, (N.D.N.Y. May 20, 1996) (holding that failure to provide sufficient evidence that plaintiff police dog handlers invested more of their own money in the City's program weighs in favor of the plaintiff); *see also, Superior Care,* 840 F.2d at 1060 (finding

**10.** Chapman asserts that he steps in only if and when a job becomes "complicated": "At times it's what they call mechanical. A mechanic has a problem laying out the job, so I walk him through, stuff like that." *See* Chapman Dep. at 170.

**11.** When asked, "So the losers get $3 a yard and the best get paid $4.50 a yard?" Chapman responded, "Yes." Chapman Dep. 125: 14–16.

**12.** When asked about his relationship with Defendant ABC, Plaintiff stated: "You are actually committed to them. There is no signed paper saying that you're committed. But verbally, they're telling you this. And if you don't—if they find out that you're working for other people, there are ways of making you pay, which is—you won't get any work." Lee Tr. Dep. 145: 13–19.

the fact that the nurses "have no independent investment in the business" weighs in favor of plaintiffs.)

Although Plaintiff used his own tools, arguably an investment in the carpet installation business, Defendant provided staples tacklers, glue, heat tape and cleaning fluid. *See* Lee Dep. 68: 24–25, 69:2, 71: 2–8, Lee Tr. Dep. 71: 18–22. Defendant argues that Plaintiff's ability to hire any number of helpers evinces an ability to control the volume of business, and hence potential profit. On the record before the Court, Plaintiff's argument that he had no significant opportunity for profit or loss from the carpet installation business is disputed.

### 3. *Degree of skill and independent initiative*

■ While a plaintiff's high degree of skill normally weighs in favor of a defendant, according to *Superior Care*, "the fact that workers are skilled is not itself indicative of independent contractor status." *Superior Care, Inc.*, 840 F.2d at 1060, 1061 (finding nurses were employees under FLSA even though were highly specialized).

Plaintiff worked as a carpet installation mechanic before he began his relationship with Defendants. *See* Lee Dep. 64: 2–9. While providing basic supplies, Defendant ABC did not give Plaintiff directions or a manual on how to install the carpet. *See* Lee Dep. 68: 21–25, 69:2, 71: 2–8.

The Parties dispute the level of skill required to be a carpet mechanic.

### 4. *Permanence or duration of the relationship*

Plaintiff's relationship with Defendants lasted for approximately eight years, from 1990 or 1991 through 1999. *See* Lee Dep. 24: 3–14. Plaintiff explains that Defendants told him that when he was "on the job" he should tell customers that he was "working for ABC." Lee Dep. 137: 22–25. Plaintiff maintains that he was "not supposed to take jobs from the customers if they want you to do other work for them." Lee Dep. 138: 2–5. Additionally, Plaintiff reveals that Defendants informed him that he should not work for other carpet installation companies while receiving assignments from ABC. Lee Dep. 145: 4–12, 14–23. Defendants dispute these assertions, arguing Plaintiff was free to work for other companies. *See* Def. 56.1 Stmt. at ¶ 45, 111. These differing interpretations, taken together, delineate disputes of material fact regarding the nature and permanence of the working relationship.

### 5. *Integral part of Defendants' business*

Combining all of its locations, Defendants grossed approximately thirteen million dollars from broadloom carpet sales last year. (*See* Chapman Dep. 59: 13–20.) During his deposition, Chapman was unable to reveal any specific information about the profit made from installation alone. *See* Chapman Dep. 64:2–15.[13] Plaintiff claims that Defendants make approximately one million dollars a year from carpet installation alone. See Pl.'s 56.1 Stmt. ¶ 31.

**13.** The letters of correspondence between counsel reveal Defendants' desire to withhold certain information regarding the specific revenue for carpet installation alone. Defendants maintain that the production of the records would be burdensome. Further-more, Defendants assert that the information contained in these records is irrelevant and production of these records would not necessarily provide Parties with an accurate calculation. Fuchsberg Decl., Ex. I.

Although specific information regarding the carpet installation profit alone would certainly be useful, other means are available to determine whether the carpet installers' work constitutes an "essential part" of ABC's business. The Supreme Court found that the determination involved whether the nature of the plaintiffs' task, considered in the context of defendant's business, was essential to the company's objective. *See Rutherford,* 331 U.S. 722, 726, 729, 730, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947) (finding that plaintiffs, boners at slaughterhouse, performed task which was integral to slaughterhouse's objective of producing boneless beef); *see also Donovan v. DialAmerica Marketing, Inc.,* 757 F.2d 1376, 1385 (3rd Cir.1985) (holding that plaintiff home researchers performed integral service for defendant's business even though work accounted for small percentage of total research completed).

Plaintiff argues that carpet installation is an integral part of ABC's business. (Pl.'s 56.1 Stmt. ¶ 9.) Plaintiff contends that the majority of ABC customers choose to have ABC arrange the carpet installation process for them. (Pl.'s 56.1 Stmt. ¶ 4.) Furthermore, ABC's own description on their website of its broadloom operation advertises that "ABC handles all types of carpet installations." (Fuchsberg Decl., Ex. E.) Defendants rather conclusory rebuttal is that "carpet installation is not an integral part of ABC's business." Def.'s 56.1 Stmt. at ¶¶ 7,9. Nevertheless, the Court finds that the contradictory record renders the Court unable to determine whether the work performed by Plaintiff was integral to ABC's business.

### 6. *Totality of Circumstances*

In the instant matter, the totality of the circumstances reveal that as a matter of economic reality, disputes of material fact exist as to whether Plaintiff is an employee of ABC Carpet that preclude summary judgment on this record.[14] Specifically, disputes exist as to whether Defendant ABC exercised substantial control over Plaintiff, Plaintiff had any real opportunity for profit or loss, the level of skill required to be a carpet mechanic, and whether Plaintiff's almost daily jobs garnered from Defendant were indeed meant to be exclusive for approximately eight years, which could demonstrate the permanence of his relationship with ABC. The carpet installation business may be considered an important part of ABC's business, but Defendant had the ability to provide records to show the significance of the installation to their business as a whole and apparently chose not to do so.

## III. CONCLUSION

For the aforementioned reasons, Defendants' motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is DENIED.

The Joint Pretrial Order shall be submitted by April 10, 2002. Memoranda of Law addressing those issues raised in the JTPO shall be submitted by April 10, 2002. Responses to the Memoranda shall be submitted by April 30, 2002. There shall be no replies.

.SO ORDERED.

---

**14.** The same holds true for Plaintiff's claims under New York Labor Law. *See, e.g., Lopez v. Silverman,* 14 F.Supp.2d 405, 411 (S.D.N.Y. 1998) (conflating analysis under FLSA and N.Y. Labor Law).