Fen X. CHEN, Qiu Chen, Yu Zheng, Chai Chen, Dang Zheng, Hua Chen, Yong Chen, Kun Huang and Qi Liu, Plaintiffs,

v.

STREET BEAT SPORTSWEAR, INC., Albert Papouchado, Michel Amar, Jian Wen Liang a.k.a. Raymond Liang, Fen Chen a.k.a. Huafen Chen, Lun Wei Fan, 1A Fashions, Inc., and Red Arrow, Inc., Defendants.

No. 01–CV–792 (ILG).

United States District Court, E.D. New York.

April 6, 2005.

Kenneth Kimerling, Asian American Legal Defense & Education, New York, NY, for Plaintiffs.

Alan B. Pearl, Alan B. Pearl & Associates, PC, Syosset, NY, Penny Ann Lieberman, Jackson Lewis, LLP, Marvin M. David, Bryer & David, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

GLASSER, District Judge.

This is an action for unpaid minimum wages and overtime compensation by garment workers against the contractors for which they worked and the manufacturer of those garments. Plaintiffs allege claims under the Fair Labor Standards Act ("FLSA"), New York Labor Law and state common law. The "manufacturer defendants," Street Beat Sportswear, Inc. ("Street Beat"), Albert Papouchado ("Papouchado"), President of Street Beat, and Michel Amar ("Amar"), CEO of Street Beat, move for summary judgment. Plaintiffs cross-move for summary judgment.

1. The parties' statements of undisputed material facts submitted pursuant to Local Rule 56.1 will be referred to as "56.1 Statements."

2. In addition to the moving defendants, plaintiffs sued Jian Wen Liang ("Liang"), Fen

## FACTS

The following material facts are undisputed unless otherwise indicated. Defendant Street Beat manufactures and distributes ladies' garments. Def. Local Rule 56.1 Statement[1] ¶¶ 1, 2. Street Beat is owned by Papouchado and Amar, each a 50 percent shareholder of the company. *See* Papouchado Dep. at 26. Papouchado is the President of Street Beat, a position he has held since 1992. Def. 56.1 Statement ¶ 7. He oversees the distribution and shipping of garments in Street Beat's Brooklyn, New York warehouse and negotiates pricing for jobs with the contractors. *Id.* ¶ 14. Additionally, he performs administrative duties, which include production and overseeing "that the work is maintained in an orderly way." *Id.* ¶ 15. Amar is the CEO of Street Beat and has been employed by that company since 1993. *Id.* ¶¶ 17, 18. Amar works in sales and marketing, but is not involved with the production or quality control department. *Id.* ¶ 20.

Street Beat's garments were completed by any one of 20 contractors, which were located primarily in Brooklyn during the times relevant to this action.[2] *Id.* ¶¶ 57, 58. The practice of outsourcing sewing and cutting is common for "jobbers," a term that refers to manufacturers who contract out the completion phase of garment production. *Id.* ¶ 60; *see also* Pl. Reply 56.1 Statement ¶ 54. It is fairly common in the garment industry for contractors to work for different manufacturers. *Id.* ¶ 110. The manufacturing process which involved the parties was as follows. Street Beat did most of its own cutting,

Chen, and Lun Wei Fan ("Fan"), who are either owners and/or supervisors of contractors to which Street Beat outsourced its sewing. Defendants 1A Fashions, Inc. and Red Arrow, Inc. are contractors which sewed garments for Street Beat. *See* Def. Mem. at 3.

but outsourced that step of the process with contractors when its employees were too busy. Mui Cert. ¶ 11. Once fabric was cut, Street Beat sent it to a sewing contractor together with trimming and a pattern it created. Id. ¶ 12.[3] Street Beat also prepared a sample of the finished garment which the contractor followed. Id. The contractor then created a sample garment and sent it to Street Beat for approval. The Street Beat pattern maker was responsible for approving the sample before mass production could commence. Id. ¶ 14.

From 1996 to 2000, plaintiffs[4] performed various tasks for contractors. They were thread cutters, garment inspectors, hangers, pressers and button hole machine operators. Contractors specialized in assembling different garments, and it was common for manufacturers to use different contractors depending on their assembling specialty. Id. ¶¶ 63, 64. The contractors operated on their own premises and owned their own equipment. Id. ¶¶ 66, 67.

Papouchado awarded contracts to contractors based on previous work they had done for Street Beat, the quality of their work, and the price they charged. Def. 56.1 Statement ¶¶ 75, 76, 103. Amar was not involved in allocating work to contractors. Id. ¶ 143. Street Beat paid the contractors a price per garment. Id. ¶ 79. That price depended on, among other things, the marketplace, the complexity of the garment and that contractor's workload. Id. ¶ 78. Street Beat instructed the contractors' accountants to pay employees by the piece instead of hourly "because piecework equaled more than the minimum wage" and "if [the workers] worked overtime, how to calculate that." Id. ¶ 184. In pricing a particular job, Papouchado did not consider whether the plaintiffs would be working overtime. Id. ¶ 100. See also Vanegas Rept. at 4 ("the price given to a contractor never takes into account the extra cost of overtime, often the most common violation in factories"). The manufacturer usually awarded the job to whichever contractor bid the lowest price. Def. 56.1 Statement ¶ 113; Pl. Reply 56.1 Statement ¶ 113. The manufacturer's pricing is also informed by what a retailer will pay it for the garments. Def. 56.1 Statement ¶ 115. Contractors used by Street Beat would sometimes work for other manufacturers. Id. ¶ 73. Sometimes contractors declined a job for Street Beat because they were too busy or the price offered was too low. Id. ¶ 92. On occasion, although Street Beat offered more money to certain contractors

---

3. Although Street Beat employees sewed sample garments, all other sewing was done by the contractors. Def. 56.1 Statement ¶ 71.

4. Plaintiff Chai Chen ("C.Chen"), was a button hole machine operator at Hua Great Procetech and Covello. Pl. 56.1 Statement ¶ 17. Plaintiff Fen X. Chen ("F.Chen") was a hanger and worked for Red Arrow and 1A Fashion. Id. ¶ 18. Plaintiff Hua Ping Chen ("H.Chen") worked as a presser for 1A Fashion and Red Arrow. Id. ¶ 19. Plaintiff Qui Ru Chen ("Q.Chen") worked as a hanger for 1A Fashion and Red Arrow. Id. ¶ 20. Plaintiff Yi Qin Chen ("Y.Q.Chen") worked as a thread cutter for Hua Great Procetech, XMG Fashion, Covello and 1A Fashion. Id. ¶ 21. Plaintiff Yong Lin Chen ("Y.L.Chen") worked

as a hanger for 1A Fashion and Red Arrow. Id. ¶ 22. Plaintiff Kun Huang (Huang) worked as a garment inspector for CCY New Worktech and New Port Fashions. Id. ¶ 23. Plaintiff Zhong Zhou Lin ("Lin") worked as a garment inspector and thread cutter for New Port Fashions, Hua Great Procetech, XMG Fashion, Covello and 1A Fashion. Id. ¶ 24. Plaintiff Qi Fen Liu ("Liu") worked as a garment inspector for New Port Fashion and Hua Great Procetech. Id. ¶ 25. Plaintiff Dang Fang Zheng ("D.Zheng") worked as a hanger and button hole machine operator for Hua Great Procetech, XMG Fashion, and Covello. Id. ¶ 26. Plaintiff Yu Qing Zheng ("Y.Zheng") worked as a garment inspector and thread cutter for Red Arrow and 1A Fashion. Id. ¶ 27.

so that they would agree to work for Street Beat instead of for another manufacturer, the contractor refused that offer. *Id.* ¶¶ 120, 121.

In general, garment industry employees might work for one contractor one day, and for another the next. *Id.* ¶ 217. The plaintiffs submitted evidence as to the hours they worked, and the amounts they were paid. *See* Kimerling Decl. (attaching declarations from plaintiffs). For example, plaintiff Q. Chen declared that she worked for Red Arrow from July 20, 1999 through November 25, 1999. Q. Chen. Decl. ¶ 11. As did many of the plaintiffs, she and her co-worker kept a notebook of how many hours they worked and how much they earned. Q. Chen recorded that she worked "7 days a week most of the time, approximately 60%. We would work 16 hours a day with a half hour off for lunch. On two weeks, we worked on the average of 18 hours a day. On the other weeks we worked 5 or 6 days a week and 13 hours a day with a half hour lunch break." *Id.* Plaintiffs stated that there were no shifts at the contractors' factories, which the defendants dispute. *See id.* ¶ 14; Pl. Reply 56.1 Statement ¶ 98; Def. 56.1 Statement ¶ 97, 98.

The contractors set the pay rate for the plaintiffs. *Id.* ¶ 219. In general, some contractor employees were paid by the hour and others by the piece. That arrangement depended on the type of work the employees did and their agreement with the contractors. *Id.* ¶ 215. The evidence shows that plaintiffs Lin and Y.L. Chen were paid both in cash and by check. *Id.* ¶ 221. Plaintiff Zheng was paid both by check and in cash when he worked for contractors XMG and Zahua. *Id.* ¶ 222. Defendants assert that Street Beat never paid the plaintiffs and Papouchado testified that he never had the authority to nor did he sign payroll checks on behalf of the contractors. *Id.* ¶ 142. Plaintiffs contend

that although they were paid directly by the contractors, to the extent Street Beat funded the contractors by supplying the majority of their work, Street Beat was *de facto* the source of their salaries. *See* Pl. Reply 56.1 Statement ¶ 142. The contractors also set plaintiffs' work schedule and gave them assignments. Def. 56.1 Statement ¶ 220.

Contractors historically did not comply with withholding requirements under the tax laws because there is an economic incentive not to report income to the IRS. *See* Def. 56.1 Statement ¶¶ 195, 196. Papouchado testified that he and Amar were aware that contractors might not be complying with tax requirements. *See* Papouchado Dep. at 128. But Papouchado further testified that he never provided assistance to contractors "that was geared toward avoiding taxes." *Id.* Plaintiffs argue that Street Beat facilitated contractors' avoidance of tax requirements by paying them for their work with checks in amounts less than $10,000 which did not have to be reported to the IRS. *See* Pl. Reply 56.1 Statement ¶ 209. The plaintiffs filed tax returns only with respect to income they received by check and some did not file tax returns at all. Def. 56.1 Statement ¶ 229.

In 1997, after several contractors with which Street Beat did business were found to have violated the FLSA, Street Beat entered into an Augmented Compliance Program Agreement ("ACPA") with the Department of Labor ("DOL"). *See* Kimerling Decl. Ex. 9. That agreement requires Street Beat, among other things, to monitor and ensure the contractors' compliance with the FLSA. Thus, one purpose of the ACPA is to stop the manufacturers from using contractors that violate labor laws. Def 56.1 Statement ¶ 173; Pl. Reply 56.1 Statement ¶ 173. Alan Smith ("Smith"), the CFO of Street Beat since on or about March 31, 1997, was involved in

monitoring Street Beat's compliance with the ACPA. Def. 56.1 Statement ¶ 165. Street Beat's quality control personnel, including Helen Cheung ("Cheung"), were also involved in monitoring contractors' compliance.

**Procedural Background**

Plaintiffs filed the complaint on February 12, 2001 and an amended complaint on May 18, 2001. Defendants moved to partially dismiss the complaint with respect to the negligence and breach of contract claims alleged, and this Court denied that motion on January 22, 2002 in *Chen v. Street Beat Sportswear, Inc.,* 226 F.Supp.2d 355 (E.D.N.Y.2002) ("*Chen I* "), familiarity with which is assumed. Thereafter, defendants filed an amended answer on March 24, 2003 and the parties engaged in discovery. Pending before the Court are defendants' motion for summary judgment filed on August 26, 2004 and plaintiffs' cross-motion for summary judgment filed on October 22, 2004.

## *DISCUSSION*

Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment is precluded only where the factual issue is genuine, which means that "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In order to survive a motion for summary judgment, "the opponent must

do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). To that end, the nonmoving party "may not rest upon the mere allegations or denials" in its pleadings; rather, it "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). When evaluating a motion for summary judgment, "the inferences to be drawn from the underlying facts .... must be viewed in the light most favorable to the party opposing the motion." *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. Guided by these principles, the Court turns to the parties' respective motions.

■■■■ Before reaching the merits, the Court addresses a jurisdictional issue raised by defendants. Defendants argue that because certain of plaintiffs' federal claims are time-barred, this Court should refuse to exercise supplemental jurisdiction over their state law claims. The FLSA provides for a two-year statute of limitations on claims for unpaid minimum wages, overtime compensation and liquidated damages and a three-year limitations period for willful violations. 29 U.S.C. § 255(a).[5] The original complaint in this action was filed on February 12, 2001. Def. 56.1 Statement ¶ 230; *see also* Pearl Aff. Ex. A. It is undisputed that plaintiffs Huang and Liu's FLSA claims accrued in 1997 and 1996–1997, respectively, and are therefore time-barred under the two-year statute of limitations. *See* Pearl Aff. Ex. G (showing damages calculations produced by plaintiffs, and none under the FLSA for Huang and Liu). Plaintiffs Y.Q. Chen and Lin filed consents to participate in the FLSA suit on August

---

**5.** Defendants do not and could not argue that plaintiffs' state labor law claims are time-barred. Claims for unpaid minimum wages and overtime compensation under the New York Labor Law are subject to a six-year statute of limitations. *See* N.Y. Labor Law §§ 198(3), 663(3).

1, 2002, *see* Def. 56.1 Statement ¶ 231, and are deemed to have commenced their action on that date. *See Gjurovich v. Emmanuel's Marketplace, Inc.*, 282 F.Supp.2d 101, 104 (S.D.N.Y.2003) (citations omitted). They claim unpaid minimum wages and overtime compensation under the FLSA for the work they performed between February 1998 and April 2000. *See* Pearl Aff. Ex. G. Thus, defendants are correct in arguing that any federal claims by Y.Q. Chen and Lin are time-barred since they accrued before August 1, 2000. *See* Def. Mem. at 41–42. Nevertheless, the Court will exercise supplemental jurisdiction over plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) given that the federal and state law claims derive from a "common nucleus of operative fact." *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

**I.** *Violations of the Fair Labor Standards Act and New York Labor Law*

 Plaintiffs assert a claim under the FLSA for unpaid overtime compensation pursuant to 29 U.S.C. § 207(a)(1) (1998).[6] That provision states in relevant part: "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." *Id.* The FLSA in turn defines an "employee," with certain exceptions not relevant here, as "any individual employed by an employer." *Id.* § 203(e)(1). The statute defines an "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee." *Id.* § 203(d). The FLSA further defines the term "employ" to include "to suffer or permit to

work." *Id.* § 203(g). An entity "suffers or permits" an individual to work if, as a matter of "economic reality," the entity functions as the individual's employer. *Goldberg v. Whitaker House Coop., Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 6 L.Ed.2d 100 (1961); *Bartels v. Birmingham,* 332 U.S. 126, 130, 67 S.Ct. 1547, 91 L.Ed. 1947 (1947) ("Obviously control is characteristically associated with the employer-employee relationship but in the application of social legislation employees are those who as a matter of economic reality are dependent upon the business to which they render service."). The Supreme Court stated that the "definition of 'employ' is broad" in that it "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles." *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992); *see also Rutherford Food Corp. v. McComb,* 331 U.S. 722, 727, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947). The Second Circuit has cautioned against applying a rigid test to determine whether an entity is an "employer" under the FLSA. "Since economic reality is determined based upon *all* the circumstances, any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." *Herman v. RSR Security Servs. Ltd.,* 172 F.3d 132, 139 (2d Cir.1999) (emphasis in original); *see also Ansoumana v. Gristede's Operating Corp.,* 255 F.Supp.2d 184, 193 (S.D.N.Y.2003) (the "economic reality" test "takes into account the real economic relationship between the employer who uses and benefits from the services of workers and the party that hires or assigns the workers to that employer").

The regulations promulgated by the DOL under the FLSA expressly provide

---

**6.** In their memorandum of law in support of their motion, plaintiffs argue that they are entitled to unpaid minimum wages pursuant to 29 U.S.C. § 206. *See* Pl. Mem. at 65–67. Curiously, plaintiffs do not plead a cause of action under that provision in the complaint.

that an individual may be employed by more than one entity. *See* 29 C.F.R. § 791.2(a) (2005). In this case, it is undisputed that plaintiffs were employed by the contractors. Plaintiffs argue that defendants are liable for their injuries under the FLSA as "joint employers." In opposition, defendants argue that plaintiffs were employed only by the contractors and not by Street Beat. Def. Mem. at 3.

■ Plaintiffs assert causes of action against defendants under N.Y. Labor Law § 190 *et seq.* and § 650 *et seq.* alleging violation of New York's minimum wage and overtime and spread of hours provisions.[7] *See* Compl. Counts Two and Three.[8] Courts hold that the New York Labor Law embodies the same standards for joint employment as the FLSA. *See Topo v. Dhir,* 2004 WL 527051, at *3 (S.D.N.Y. Mar.16, 2004) (noting that there is "general support for giving FLSA and the New York Labor Law consistent interpretations"); *Ansoumana,* 255 F.Supp.2d at 189 ("because New York Labor Law

and the FLSA embody similar standards . . ., I will consider the federal law in deciding whether defendants were joint employers"); *Lopez v. Silverman,* 14 F.Supp.2d 405, 411 n. 4 (S.D.N.Y.1998) (considering federal law only as to question of joint employment under federal and New York law). Indeed, like the FLSA, New York Labor Law defines "employed" to include "permitted or suffered to work." *See* N.Y. Labor Law § 2(7).[9] Both parties agree that courts apply similar standards under federal and New York law. *See* Pl. Mem. at 37.[10] Because the standards under both laws are similar, the Court will consider the "economic reality" test under federal law as to defendants' liability as joint employers under both federal and New York law.

In *Zheng v. Liberty Apparel Co., Inc.,* 355 F.3d 61, 72 (2d Cir.2003) (hereinafter "*Liberty* "), the Second Circuit considered whether garment manufacturers who hired contractors to assemble the garments were joint employers of the contractors' employees under the FLSA. To that end, the

---

**7.** Under N.Y. Labor Law § 652, workers are entitled to an extra hour of pay on each day on which they work over 10 hours in violation of § 190 *et seq.* and § 650 *et seq.*

**8.** All citations to "Compl." are to the Amended Complaint. *See* Pearl Aff. Ex. B.

**9.** Defendants' argument that there is "no true statutory definition of 'employer' or 'employ' under the New York Labor Law" is unavailing. *See* N.Y. Labor Law § 190(2),(3); § 651(5). *See* Def. Mem. at 20. It follows that defendants' argument is unpersuasive that a finding regarding employment necessarily depends on plaintiffs having asserted a cause of action under N.Y. Labor Law § 345–a. *See id.*

**10.** Plaintiffs rely on *People v. Sheffield Farms–Slawson–Decker Co.,* 225 N.Y. 25, 121 N.E. 474 (1918), in arguing that New York Labor Law recognizes liability in certain instances against indirect employers. *See* Pl. Mem. at 35. While this is not a misstatement of the holding of that case, *Sheffield* concerned the

employment of minors, an offense formerly found under N.Y. Labor Law § 162, which is irrelevant to this case. Plaintiffs cite two cases in support of their argument that the New York Labor Law applies broadly to employment relationships. *See Green v. McMullen, Snare & Triest, Inc.,* 177 A.D. 771, 164 N.Y.S. 948 (1st Dep't 1917) (holding that plaintiff was an "employee" of defendant under N.Y. Labor Law § 2 even though he was not paid directly by defendant); *In re Larry Jay, Inc.,* 3 A.D.2d 386, 160 N.Y.S.2d 790 (1st Dep't 1957) (discussing the obligation of jobbers in the garment industry to make fund contributions on behalf of workers under Debtor and Creditor Law § 22). While both cases utilize a broad definition of employment, they do not compel the Court to apply a different analysis of joint employment than that set forth in the *Zheng v. Liberty Apparel Co., Inc.,* 355 F.3d 61 (2d Cir.2003), discussed *infra,* which itself takes a broad approach to joint employment.

Second Circuit relied on the Supreme Court's seminal decision in *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 67 S.Ct. 1473, 91 L.Ed. 1772 (1947). The issue in *Rutherford* was whether Kaiser, a slaughterhouse, could be held liable as the joint employer of meat boners for violating overtime requirements and record keeping provisions of the FLSA. *Id.* at 723–24, 67 S.Ct. 1473. Kaiser contracted with Reed, an experienced boner, who hired a group of meat boners to work on the premises of the slaughterhouse. Under the contract, Kaiser paid Reed per hundredweight of boned beef and Reed paid the boners, his employees. *Id.* at 724–25, 67 S.Ct. 1473. Although Reed later abandoned the .contract with Kaiser, the boners continued to work at the slaughterhouse pursuant to several subsequent oral and written contracts between Kaiser and boning supervisors who had worked with Reed. *Id.* at 725, 67 S.Ct. 1473. In addition to providing physical space to the boners, Kaiser supplied them with equipment, while the boners used their own tools. In removing the bone from the meat, the boners performed a step in the slaughtering process and were supervised by Kaiser management. *Id.* at 725–26, 67 S.Ct. 1473. Based "upon the circumstances of the whole activity," *Rutherford* held that defendant slaughterhouse was the joint employer of the meat boners under the FLSA. *Id.* at 730, 67 S.Ct. 1473.

■ Based in part on its analysis of *Rutherford*, the Second Circuit in *Liberty* set forth six factors to be considered in determining joint employment:

(1) whether [the putative joint employer's] premises and equipment were used for the plaintiffs' work; (2) whether the [contractors] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to [the putative joint employer's] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which [the putative joint employer or its agents] supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for [the putative joint employer].

355 F.3d at 72. "These particular factors are relevant because, when they weigh in plaintiffs' favor, they indicate that an entity has functional control over workers even in the absence of [ ] formal control. . . ." *Id.*[11] Each of those factors will be

---

**11.** In *Liberty,* the Second Circuit reviewed its own and district court precedent in clarifying the appropriate test for joint employment. In particular, the Court cited its prior decisions in *Carter v. Dutchess Cmty. Coll.,* 735 F.2d 8 (2d Cir.1984), and *Brock v. Superior Care, Inc.,* 840 F.2d 1054 (2d Cir.1988). In *Carter,* the Court set forth the following factors for measuring an employer's formal control over its employees: "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." 735 F.2d at 12 (citation omitted). *Superior Care* adopted an expanded version of that test. 840 F.2d at 1058–59. The *Liberty* Court also cited *Lopez,* a case involving the

garment industry, in which the court applied seven factors it gleaned from *Carter, Superior Care* and *Rutherford* in determining joint employer liability under the FLSA. *See* 14 F.Supp.2d at 419–20. Based on those cases, *Liberty* held that the district court erred by applying exclusively the four *Carter* factors and remanded the case with instructions directing the court to consider six factors it drew from *Rutherford.* 355 F.3d at 69, 71–72. Defendants in this case argue that in light of *Liberty,* the *Lopez* decision "is dead letter law." Def. Mem. at 10 n. 4. The Court disagrees. While *Liberty* clarified the test for joint employment in this circuit, it found that the district court erred in declining to follow *Lopez* while applying the four *Carter* factors. 355 F.3d at 69–70. Moreover, *Lopez* and

considered in light of the evidence presented.

### 1. Separate premises and equipment

█ The first factor is whether plaintiffs used Street Beat's premises and equipment. The Court in *Rutherford* considered this factor in analyzing the employment relationship between the meat boners and the defendant slaughterhouse and found significant that the slaughterhouse provided a room on its premises where the boners performed their work. *Id.* at 725, 67 S.Ct. 1473.[12]

Plaintiffs concede the physical separation between the contractors' factories and Street Beat, but argue that "Street Beat had authority and proximity granting its personnel unfettered access to the factories where its garments were sewn." Pl. Mem. at 11.[13] Plaintiffs assembled Street Beat's garments at those factories instead of on the premises of Street Beat. Thus, unlike in *Rutherford,* the evidence does not show that "[p]ractically all of the work entering into the unit is done at one place and under one roof." 331 U.S. at 726, 67 S.Ct. 1473.

The evidence further establishes that, on rare occasions, the plaintiffs used the premises of Street Beat. In his deposition, Papouchado testified that "once or twice" garments were not bundled correctly and the "owner or manager of the factory would come with three or four people and they would rebundle them in our premise." Papouchado Dep. at 197. Papouchado further emphasized in his testimony that this occurred "once or twice in all the years we have been in business" and that Street Beat never provided the contractors with work sites or loans to secure work sites. *Id.* at 198. Plaintiff Zheng testified that he worked on garment tags on the premises of Street Beat once in 1997 and once in 1998. Zheng Dep. at 79. *See also* Q. Chen Dep. at 87. This is not sufficient to raise a genuine issue of material fact as to whether Street Beat had functional control over plaintiffs by virtue of their use of defendants' premises.

With regard to equipment used for sewing the garments, it is undisputed that the contractors used their own equipment instead of Street Beat's. Def. 56.1 Statement ¶ 67. Street Beat, however, provided the contractors with all materials, including the cut garment, the trimming, the hanger, the "poly bag" and labels, except for the thread necessary to complete the sewn garments. *See* Papouchado Dep. at 100–1. In addition, Street Beat provided assembly instructions to the contractors. *See id.* at 102. In *Rutherford,* the Court noted that the contractor and the slaughterhouse stipulated that the boners owned their own tools, including "a hook to hold the meat, a knife to cut it, a sharpener for the knife, and a leather belt (apron)," but plaintiffs used the equipment of the

---

*Liberty* employed similar analyses in that both relied principally on *Rutherford* and rejected the rigid test promulgated in *Carter.*

12. Although the *Liberty* Court's discussion of this factor—which it described as "straightforward"—was brief, it seems to have been significant in other courts' analyses of joint employment. *See, e.g., Ansoumana,* 255 F.Supp.2d at 195 (noting that delivery workers worked on the premises of the putative joint employer, and distinguishing other cases where plaintiff workers did not work in the same physical space as the defendant).

13. Plaintiffs construe this first *Liberty* factor as relating to the "manufacturers' ease of access to work area." Pl. Mem. at 11. Their attempt to broaden the analysis of this factor is unpersuasive given the *Liberty* Court's observation that this factor "require[s] minimal discussion." 355 F.3d at 72. Similarly unavailing is plaintiffs' discussion of evidence of supervision with respect to this factor for the same reason. *See* Pl. Mem. at 12. The Court discusses that evidence *infra* with respect to the fifth factor under *Liberty.*

slaughterhouse. 331 U.S. at 725, 730, 67 S.Ct. 1473. The Court found that those facts weighed in favor of joint employment. Here, given the separate premises and equipment used, the Court finds that this factor weighs against a determination that defendants were joint employers of plaintiffs.

### 2. Whether the contractors shifted as a unit

■ Second, *Liberty* considered whether plaintiffs are employees of a business organization "that could or did shift as a unit from one putative joint employer to another." 355 F.3d at 72. This second factor "is relevant because a subcontractor that seeks business from a variety of contractors is less likely to be part of a subterfuge arrangement than a subcontractor that serves a single client." *Id.*[14] In other words, if the contractors for which plaintiffs worked accepted jobs from an array of manufacturers, this would suggest that plaintiffs were not tied to Street Beat as a joint employer.

Defendants argue that plaintiffs did not work exclusively for Street Beat. *See* Papouchado Dep. at 174. Moreover, the parties do not dispute that contractors specialized in assembling different garments, and it was common for manufacturers to use different contractors depending on the contractors' speciality. Def. 56.1 Statement ¶¶ 63, 64. Similarly, in the garment industry it is fairly common for contractors to do work for different manufacturers. *Id.* ¶ 110.

By contrast, plaintiffs argue that the contractors "were entirely dependent upon Street Beat to supply them with work because of the overabundance of sewing factories in relation to the number of manufacturers with work available." Pl. Mem. at 13. This fact strongly suggests that the plaintiffs were employed by contractors which, by virtue of those market factors, were caused to rely primarily upon work supplied by Street Beat.

The *Rutherford* Court found that the boners working for defendant slaughterhouse "had no business organization that could or did shift as a unit from one slaughter-house to another." 331 U.S. at 730, 67 S.Ct. 1473. This finding can be seen in light of the *Rutherford* Court's other findings of functional control by the defendants over plaintiffs' work because the plaintiffs worked on the premises of the slaughterhouse. By contrast, the contractors in this case did not work on the premises of Street Beat. The evidence that the contractors worked for various manufacturers in the garment industry and not exclusively for Street Beat raises a question of fact as to whether plaintiffs were employed by a unit that could or did shift from one manufacturer to the other.

### 3. Plaintiffs' work as integral to manufacturing

■ The third of the *Liberty* factors is "the extent to which plaintiffs performed a discrete line-job that was integral to [the putative joint employer's] process of production." 355 F.3d at 72. The *Liberty* Court derived this factor from the statements in *Rutherford* that the boners "did a specialty job on the production line" and that the work of the boners "was more like

---

**14.** As the Court in *Liberty* explained, there is substantial overlap between this factor and the sixth factor, discussed *infra*, concerning whether the plaintiffs performed all or almost all of their work for defendants. 355 F.3d at 75 n. 12. The two factors have almost an inverse relationship: where the evidence establishes factor two, defendants are less likely to be a joint employer of plaintiffs; on the other hand, where the evidence shows that plaintiffs worked predominantly for defendants, factor six is satisfied, but not factor two.

piecework than an enterprise that actually depended for success upon the initiative, judgment or foresight of the typical independent contractor." 331 U.S. at 730, 67 S.Ct. 1473. *Liberty* characterized the *Rutherford* employment arrangement, at "one end of the spectrum," as one involving "piecework on a producer's premises that requires minimal training or equipment, and which constitutes an essential step in the producer's integrated manufacturing process." 355 F.3d at 73. The Court characterized work at the other end of the spectrum as that which "is not part of an integrated production unit, that is not performed on a predictable schedule, and that requires specialized skills or expensive technology." *Id.*

Plaintiffs argue that this case is analogous to *Rutherford.* Specifically, they argue that plaintiffs were paid by the piece and that Street Beat paid the contractors according to the number of pieces. Pl. Mem. at 15. Moreover, the work performed by plaintiffs required minimal training. *Id. See also* Vanegas Decl. ¶ 9(a)-(b) (noting that large numbers of poor immigrant women with little or no education seek garment work and that the work is "straightforward and uncomplicated"). Indeed, plaintiffs performed the assembly aspect of Street Beat's production and used materials provided by Street Beat. *See* Papouchado Dep. at 100–2. Once the garments were completed at the contractors' factories, Street Beat arranged to bring them back to Street Beat's warehouse. *Id.* Based on this process, plaintiffs argue that their work was integral to Street Beat's manufacturing operation. Pl. Mem. at 16.

This case is distinguishable from *Rutherford* because, although plaintiffs performed piecework in the garment manufacturing process, they worked in contractors' factories instead of on the premises of the putative joint employer. *See* Pl. Mem. at

16. According to *Lopez,* however, physical proximity is not dispositive where the plaintiffs do work that is integral to the production of defendants' products. To that extent, this factor may be regarded as a caveat to the first *Liberty* factor. The facts here are similar to those in *Lopez,* where the court found that plaintiffs' sewing work in the assembly phase of production constituted a vital part of defendant's production of garments and functioned "essentially as [defendant's] own sewing and pressing unit, merely located a few blocks away from the main plant." 14 F.Supp.2d at 420. Accordingly, because plaintiffs performed piecework for Street Beat rather than work which depended on their "initiative, judgment or foresight," *Rutherford,* 331 U.S. at 730, 67 S.Ct. 1473, the Court finds that plaintiffs' work was integral to Street Beat's manufacturing process.

The *Liberty* Court was "mindful of the substantial and valuable place that outsourcing, along with the subcontracting relationships that follow from outsourcing, have come to occupy in the American economy." 355 F.3d at 73. Moreover, the Court "resist[ed] the temptation to say that any work on a so-called production line—no matter what product is being manufactured—should attract heightened scrutiny." *Id.* Instead, to determine the weight of the third factor, the Court stated that "industry custom and historical practice should be consulted," as it was in this case. *Id.* It also cautioned that "this factor . . . is not independently determinative of a defendant's status, because the mere fact that a manufacturing job is not typically outsourced does not necessarily mean that there is no substantial economic reason to outsource it in a particular case." *Id.* at 74.

Plaintiffs argue that Street Beat outsources its sewing in order to evade the

labor laws requiring it to pay minimum wage and overtime to workers. Pl. Mem. at 18. This, they argue, is a "presumption created by the historical reasons for contracting." *Id.* at 19. Plaintiffs present the testimony of Richard A. Greenwald, Ph.D. ("Greenwald")[15] regarding the history of the garment industry and the evolution of the modern garment industry. *See* Kimerling Decl. Greenwald Decl. Ex. 1 ("Greenwald Rept."). Greenwald notes that the garment industry is one of fixed costs, with a low profit margin, which sought to increase efficiency (and profit margin) by lowering both labor costs and standards, or "sweating labor." *Id.* at 3–4. The in-dustry has been able to do this, in part, because of the abundance of recent immigrants whom it has employed cheaply, the lax enforcement of labor standards, the demand by retailers for cheaper goods, and a jobber system that decentralizes the industry.[16] *Id.* at 4. Given that domestic manufacturers and factories are also in competition with overseas producers, Greenwald opines that the manufacturer using the cheapest labor to produce its goods "has a distinct competitive advantage." *Id.*

■ Plaintiffs also rely on the testimony of Louis B. Vanegas ("Vanegas"), whom they proffer as an expert witness.[17] Vane-

**15.** Defendants dispute the admissibility of Greenwald's testimony as an expert witness, arguing principally that his testimony is irrelevant and his qualifications are insufficient. *See* Def. Mem. at 50. The Court finds that Greenwald's testimony is relevant because it illuminates the history and custom of the garment industry, evidence deemed pertinent by the *Liberty* Court. Moreover, Greenwald is qualified as an expert witness under Fed. R.Evid. 702 based on his extensive publication on the subject of labor practices and the garment industry as evidenced by his *curriculum vitae*. *See* Greenwald Rept. at 22–25.

**16.** Greenwald explains that the jobber system of producing garments began to dominate the industry after World War I. *See* Greenwald Rept. at 14. That system was premised on evading restrictions on contracting and thereby took advantage of lower production costs. A principal reason for the shift to the jobber system was to evade compliance with labor laws. Jobbers "simply contracted a job at a set price and how the contractor met that price did not concern the jobbers." *Id.* at 16. Jobbing put downward pressure on the cost of labor, which "naturally led to the use of sweatshops." *Id.* at 15. Under this system, jobbers could avoid the power of the unions and disregard union labor standards.

**17.** In their opposition brief, defendants dispute the admissibility of Vanegas's testimony as irrelevant and unreliable. *See* Def. Opp. at 50. The Court disagrees. Vanegas is qualified based on his experience and skill. He worked for the DOL's Wage and Hour Division as a Compliance Officer from 1987 to 2002. *See* Kimerling Decl. Vanegas Decl. Ex. 1 ("Vanegas Rept.") at 1. In that capacity, he enforced compliance with FLSA requirements predominantly in the garment industry. Vanegas participated in the DOL's "No Sweat" program, which was designed to eradicate sweatshops, or garment factories that persistently violated the labor laws. In 1993, he was promoted to the position of Apparel Industry Specialist, which entailed managing the "No Sweat" program throughout the Northeast. From 1999 through April 2002, Vanegas was a New York City District's Office Wage and Hour manager, where he supervised 30 labor investigators and remained involved in compliance with labor laws in the garment industry. Since leaving the DOL, Vanegas works in the private sector monitoring compliance with labor laws. *See* Vanegas Decl. ¶ 8. Throughout all of these positions, Vanegas studied the prevalence of noncompliance with labor laws in the garment industry by conducting hundreds of interviews with workers, factory managers, manufacturers, and quality control staff. Additionally, Vanegas has testified as an expert in FLSA cases involving the garment industry. The methodology for Vanegas's report, although not specified therein, appears to be based on investigations into the garment industry, including interviews with quality control staff from Street Beat. Vanegas Dep. at 97. Based on the above, the Court finds that the testimony of Vanegas is admissible pursuant to Fed.R.Evid. 702.

gas concluded that underpaying workers—and therefore failing to comply with the FLSA—is endemic to the garment industry because contractors that hire workers such as plaintiffs do not earn enough under the contracts with manufacturers to adequately pay them. Moreover, Vanegas determined that "the principal factor which leads to the payment of garment workers hired by a contractor at lower rates than if they had been hired directly by the manufacturer to perform the same work is not an economic one but, rather, is the notion that the manufacturer will not be subject to liability in damages for wage and hour violations to which the workers hired by the contractor to assemble the manufacturers' garments are subjected." Vanegas Decl. ¶ 9(p).

Defendants argue that garment manufacturers historically have outsourced sewing and used a variety of contractors in order to remain competitive given the increase in overseas production of goods. Def. Mem. at 14. Papouchado testified that by outsourcing sewing, Street Beat is able to conduct its business more efficiently.[18] Papouchado Dep. at 102. Defendants' expert witness Peter Conticelli[19] opined that "the ladies' apparel industry has re-

quired ... the production of garments to out source [sic] companies which work at an arm's length relationship with their supplier." Pearl Aff. (Dec. 6, 2004), attaching Declaration of Peter Conticelli ("Conticelli Decl."). Conticelli concludes that the garment manufacturing industry contracts out certain aspects of production to be done more cheaply to remain competitive in the increasingly global garment industry. See Conticelli Rept. at 1.[20]

Conticelli's testimony does not contradict that of plaintiffs' experts as to the historic competitive pressures that existed in the garment industry. The Court finds that these expert opinions do not compel the conclusion either that the custom of outsourcing in the garment industry is motivated by lawful, economic concerns or that it is founded on jobbers' desire to evade the labor laws. Indeed, courts have found that outsourcing in particular industries can increase the economic efficiency of production and that this practice does not necessarily raise red flags regarding evasion of the labor laws. See Liberty, 355 F.3d at 73; see also Ansoumana, 255 F.Supp.2d at 195 (holding that plaintiff delivery workers performed an integral task to Duane Reade's operations by "en-

18. Defendants also argue that because clothing styles are seasonal, manufacturers have to outsource the assembly process to remain competitive. Def. Mem. at 14. Plaintiffs refute defendants' suggestion that the reason for outsourcing is because the fluctuation in types of fabrics used in its clothing requires the use of different machinery. Pl. Mem. at 19. They argue that there is no evidence of this sort of variation in production which requires outsourcing to specialty contractors. Indeed, defendants offer no evidence to support this assertion and the Court finds this point unpersuasive.

19. Conticelli testifies as an expert based on 40 years of experience in the garment industry during which he worked at and owned a contractor factory. Since 1983, he has been the Executive Director of the American Cloak

and Suit Manufacturers' Association, Inc., an organization that represents ladies' coat and suit contractors in negotiating collective bargaining agreements with labor organizations. Additionally, Conticelli has been appointed as Trustee for various employee benefit funds. See Conticelli Rept. at 6.

20. This is disputed by Vanegas who testifies that manufacturers could easily and inexpensively assemble garments in-house. Vanegas Decl. ¶ 9(b). Moreover, Vanegas stated that there is no real "bargaining" process between manufacturers and contractors because, due to the overabundance of laborers, contractors are aware that if they refuse the price offered by a manufacturer, that manufacturer can readily contract with another contractor that will accept the price offered. Id. ¶ 9(g).

abling Duane Reade to compete more effectively with mail order fulfillment companies and other drug stores ·by offering drug deliveries to its customers"). Nevertheless, in view of the finding that plaintiffs' piecework was integral to Street Beat's manufacturing process, this factor weighs in favor of joint employment.

### 4. Responsibility passes without material change

■ The fourth *Liberty* factor is "whether responsibility under the contracts could pass from one subcontractor to another without material changes." 355 F.3d at 72. This factor relates to the interchangeability of contractors. *See Lopez*, 14 F.Supp.2d at 422 (finding evidence supporting this factor where contractors could be replaced at the whim of the putative joint employer). The Court explained that this factor will not support a determination of a joint employer relationship where "employees work for an entity (the purported joint employer) only to the extent that their direct employer is hired by that entity...." *Liberty*, 355 F.3d at 74.

■ Defendants argue that plaintiffs worked for contractors only to the extent that those entities contracted with defendant manufacturer. Def. Mem. at 15. By contrast, plaintiffs assert that they worked for Street Beat irrespective of contracts between the contractors and Street Beat. Plaintiffs argue that this case is analogous to *Rutherford,* where the Court held that responsibility under contracts passed without material change because,· even after supervisors left their positions and contracts were abandoned, individual boners continued to work for the slaughterhouse. *See Rutherford,* 331 U.S. at 725, 67 S.Ct. 1473; Pl. Mem. at 21. First, they argue that, as in *Rutherford,* the fact that the labor was manual permitted contracts

(written or unwritten) to pass freely between contractors and the putative joint employer. Here, plaintiffs performed the manual, generally unskilled labor of sewing garments. Second, plaintiffs argue that their work was directed at producing a simple product. *Id.* Third, plaintiffs argue that the work was labor-intensive so that capital improvements would not result in opportunities for competition or reduce production costs. *Id.* Plaintiffs contend that, based on these three factors, Street Beat became the joint employer of the plaintiffs. *Id.*

Plaintiffs present evidence of the bargaining process between contractors and Street Beat to demonstrate that the workers were replaceable. Street Beat entered into contracts with contractors based on the lowest price offered, which takes into account wages paid to workers, but not the adequacy of those wages. Pl. Mem. at 22. *See also* Claudino Dep. at 52–53 (testifying that labor is a "major factor" in the price a contractor offers for a job to a manufacturer).[21] Moreover, plaintiffs argue that the work they did for Street Beat was negotiated by a core group of agents of the contractors, including defendants Liang and Fan, without regard to specific agreements between contractors and manufacturers. Pl. Mem. at 23. Fan, a supervisor at Red Arrow and 1A Fashions, was responsible for going to Street Beat to request work. Fan Dep. at 79–80. Fan further testified that the price for each type of garment was set by Street Beat before workers in his factory assembled the garment and any negotiating occurred, if at all, only after the garments were completed. *Id.* at 124.

Plaintiffs' work was transient. Plaintiffs assert that·they moved from one contractor to another in order to work on Street Beat's orders. Pl. Mem. at 24. *See* F.X.

---

**21.** Claudino also testified that the type of material required to make a garment determines the price a contractor might charge. *See* Claudino Dep. at 55.

Chen Decl. ¶¶ 7, 8; H. Chen Decl. ¶ 2; Q. Chen Decl. ¶¶ 7, 8; Y.L. Chen Decl. ¶ 4. Similarly, the entities for which plaintiffs worked were in flux. The evidence shows that contractors occasionally changed their names at least in part because management or ownership changed. *See* Papouchado Dep. at 127; *see* Papouchado Decl. (Aug. 25, 2004) ¶ 23; *see also* Kimerling Decl. Ex. 5 (*CCY New Worktech, Inc.*, 329 NLRB No. 24 (1999) at ¶ 10, finding Hua Great and XMG are affiliated businesses with common ownership and management). As a general matter, it is difficult to determine contractors' ownership. Def. 56.1 Statement ¶ 70. There is no evidence that plaintiffs ceased working on Street Beat garments when these changes occurred.

Based on the evidence presented by plaintiffs, the Court finds that plaintiffs were tied to Street Beat rather than to the contractors that hired them. *See Rutherford*, 331 U.S. at 725, 67 S.Ct. 1473 (finding that boners were dependent on the slaughterhouse rather than on boning supervisors). *See also Lopez*, 14 F.Supp.2d at 422 (evidence that when a contractor went out of business there was no material change in working relationship between plaintiff workers and defendant manufacturer supported joint employment under factor four). Thus, this favor weighs in favor of a finding of joint employment.

### 5. Degree of supervision

In the context of this case, the Court must also consider "the degree to which [the putative joint employer or its agents] supervised plaintiffs' work." *Liberty*, 355 F.3d at 72. The Court cautioned that this factor does not contemplate the generic control over an individual's work that may typify the relationship between a supervisor and a subcontractor. Instead, this factor analyzes the degree of supervision "only if it demonstrates effective control of the terms and conditions of the plaintiff's employment." *Id.* at 75.

As a threshold matter, the Court will not consider evidence plaintiffs present with respect to this factor to the extent it concerns the presence of Street Beat quality control personnel at the contractors' factories to monitor the quality of the work. *Liberty* explicitly stated that evidence of "supervision with respect to contractual warranties of quality and time of delivery has no bearing on the joint employment inquiry, as such supervision is perfectly consistent with a typical, legitimate subcontracting arrangement." 355 F.3d at 75. *See* Def. Mem. at 15–16.

In *Rutherford*, the Court found that the managing official of defendant plant "kept close touch on the operation." 331 U.S. at 730, 67 S.Ct. 1473. The evidence in this case shows that Helen Cheung, a quality control inspector and a Street Beat employee, spent 100% of her time at the contractors' factories, Pl. 56.1 Statement ¶ 29, visiting each for about one half hour to perform quality control. Cheung Dep. at 21. Cheung testified that she gave instructions directly to the workers "[o]n the garment, on how to work on the garments." *Id.* at 43. The parties dispute, however, whether quality control staff notified workers or contractor managers of deficiencies in the garments. *See* Def. 56.1 Statement ¶ 154; Pl. Reply 56.1 Statement ¶ 154. Papouchado occasionally visited the factories where plaintiffs worked. *See* Papouchado Dep. at 74 (stating that from 1996 to 2000 he visited the factories five or six times).[22] Papouchado, testified, howev-

---

**22.** Papouchado testified that on one occasion, a quality control person noticed that a garment worker was pressing two or three garments at one time. Thereafter, the "manager" of the contractor fired the worker. Plaintiffs argue that the worker was terminated because of the displeasure of Street Beat's quality control inspector. Pl. Mem. at

er, that he had no control over the hours or days on which plaintiffs worked and never hired or fired workers of the contractors.[23] Papouchado Decl. (Aug. 25, 2004) ¶¶ 26–29. Thus, while there is some evidence that Street Beat employees were present at the contractors' factories, the evidence does not show that Street Beat "kept close touch" on the factories' operation.

The strongest evidence of Street Beat's control over the conditions of plaintiffs' employment is that Street Beat determined the turnaround time for garment production by the contractors and their workload. Papouchado Dep. at 193. Papouchado testified that he has "some knowledge of how long it takes for a sewing factory to sew a garment." Id. at 67. See also Vanegas Rept. at 4 (stating that manufacturers' production staff monitored timeliness of production, and had quality control inspectors in the factories). He further testified that Street Beat kept contractors busy during slower times so that when there was a lot of work to do, Street Beat would have contractors willing to work for it. Papouchado Dep. at 190. The quality control person present at the contractors' factories would direct plaintiffs as to how many garments needed to be finished that day. See F. Chen. Decl. ¶ 6; Q. Chen Decl. ¶ 6. Quality control personnel monitored the workload at the contractors' factories and determined whether, if a given factory had a lot of work for other manufacturers, this would delay completion of garments for Street

Beat. See Cheung Dep. at 38–39; Papouchado Dep. at 70; see also Vanegas Rept. at 4 (stating that generally manufacturers' quality control staff "spent hours in the factories, directing the work"). Once notified by quality control personnel, Street Beat would then decide whether to leave that job at that contractor or move the job to another to expedite production. Papouchado Dep. at 70. Additionally, Cheung gave orders to plaintiffs regarding the priority of work on garments. Cheung Dep. at 43.[24]

The contractors' hours were to some extent determined by the number of garments to be assembled and the deadline for that assembly. See Fan Dep. at 23–24. Ai Ling Mui, a Street Beat Production Assistant from March 1998 to March 2001 who reported to Papouchado and speaks languages common to the garment workers, declared that she called the contractors working on orders for Street Beat daily "to find out if they were still on schedule according to plan." Mui Cert. ¶¶ 6, 8. Mui called the contractors to tell them when the "sales personnel" at Street Beat wanted orders done on a priority basis. Id.

Therefore, although it did not set plaintiffs' hours or other terms of their employment, Street Beat at least indirectly controlled the number of hours plaintiffs worked and this condition of their employment. See Rutherford, 331 U.S. at 726, 67 S.Ct. 1473 (defendant "never attempted to control the hours of the boners, but they

---

26. Papouchado, however, explicitly testified that the worker was not fired at the request of Street Beat. Thus, this testimony adds little to a finding that Street Beat controlled the terms and conditions of plaintiffs' employment.

23. It is undisputed that Street Beat did not hire or fire employees of the contractors. Def. 56.1 Statement ¶¶ 25, 125. Instead, the

supervisors and/or owners of contractors hired and fired plaintiffs. Id. ¶¶ 227, 228.

24. According to Liang's deposition testimony, at least with respect to Hua Great, Street Beat monitors never gave instructions directly to the workers, never told them to work faster, never disciplined the workers, and never fired any workers or told Liang to fire workers. See Liang Dep. at 112–13.

must 'keep the work current and the hours they work depend in large measure upon the number of cattle slaughtered' ").

The Court finds that there are genuine issues of material fact as to whether and to what degree Street Beat supervised plaintiffs' work. *See Astudillo v. U.S. News & World Report*, 2004 WL 2075179, at *3 (S.D.N.Y. Sept.17, 2004) (denying summary judgment for defendant where evidence that defendant's employee gave plaintiff some instruction and defendant granted plaintiff certain employee benefits raised disputed issues of material fact as to degree of supervision).

### 6. Plaintiffs worked exclusively or predominantly for defendants

Finally, the Court considers "whether plaintiffs worked exclusively or predominantly for" the purported joint employer. *See Liberty*, 355 F.3d at 72. Where the evidence establishes that the plaintiffs performed all or nearly all of their work for defendants, "the joint employer may *de facto* become responsible, among other things, for the amount workers are paid and for their schedules, which are traditional indicia of employment." *Id.* at 75.

The parties dispute what percentage of the contractors' work was for Street Beat. *See* Pl. Reply 56.1 Statement ¶ 122. The evidence in the record on this issue is either unspecific or disputed. For example, defendant Fan testified that he believed that all of Red Arrow's [25] work was for Street Beat. *See* Fan. Dep. at 58; Pl. Reply 56.1 Statement ¶ 123. Plaintiffs who worked at Red Arrow testified that they worked "almost exclusively on the garments of Street Beat." *See* F. Chen Decl. ¶ 2; H. Chen Decl. ¶ 3; Q. Chen Decl. ¶ 2; Y.L. Chen Decl. ¶ 1; Y. Zheng Decl. ¶ 7.

Plaintiffs who worked at 1 A Fashion [26] testified that they worked "almost exclusively on the garments of Street Beat." *See* F. Chen Decl. ¶ 2; H. Chen Decl. ¶ 3; Q. Chen Decl. ¶ 2; Y.L. Chen Decl. ¶ 1; Y. Zheng Decl. ¶ 7. Plaintiff D. Zheng stated that the work he did at XMG was "almost exclusively" for Street Beat. D. Zheng Decl. ¶ 7. In or around 1998 and 1999, the contractor Covello worked exclusively on garments for Street Beat according to a DOL Narrative Report. *See* Kimerling Decl. Ex. 3; *see also* D. Zheng Decl. ¶ 7 (referring to Covello and other contractors and stating, "I estimate that at least 95% of the work that I did in each of the factories was on garments for Street Beat").

Papouchado declared that "Street Beat has never been the exclusive client to any of the companies [to] which Street Beat outsources its sewing." Papouchado Decl. (Aug. 25, 2004) ¶ 18. With respect to what percentage of the contractors' work was for Street Beat, Papouchado's testimony is equivocal. He estimated that about 50 to 75% of the work at each of Hua Great, City Garment and XMG was for Street Beat. *See* Papouchado Dep. at 175–77. Papouchado qualified this number by indicating that the proportion of a given contractor's work for Street Beat changed seasonally and was typically greater in the spring. *Id.* at 176–77.

It is undisputed that no employees of Hua Great worked exclusively on jobs for Street Beat. Def. 56.1 Statement ¶ 129.

25. Red Arrow factory was located at 740 64th Street. *See* F. Chen Decl. Ex. 1 (attaching pay stubs showing address for Red Arrow, Inc.). In their declarations, plaintiffs refer to factories by address and the Court has noted the names of factories where apparent.

26. 1 A Fashion, Inc. was located at 759 65th Street in Brooklyn, New York. *See* F. Chen Decl. Ex. 1 (attaching pay stubs for 1 A Fashion, Inc. showing address).

Liang testified that "more than 80 percent" of Hua Great's work during the ten months it was operational was for Street Beat. Liang Dep. at 79; Pl. Reply 56.1 Statement ¶ 117. Liang further testified that "more than 50 percent" of Newport Fashion's work was on Street Beat garments. Liang Dep. at 78.

Papouchado testified as to sums that Street Beat spent on outsourcing to particular contractors in relation to the total amount it spent on outsourcing in 1999 and 2000. For example, he testified that of the $14,662,506.62 that Street Beat spent on outsourcing in 1999, $510,691.59 (3.48%) was for 1A Fashion; $621,156.61 (4.24%) was for Red Arrow; $896,964.33 (6.12%) was for Covello and $1,377,053.76 (9.39%) was for XMG. Papouchado Decl. (Dec. 1, 2004) ¶ 21. Defendants argue that this indicates that these contractors did "minimal" work for Street Beat. Def. Opp. at 17.

Unlike in *Lopez*, the evidence in this case is disputed as to what percentage of Street Beat's work was performed by the contractors that employed plaintiffs and what percentage of the work of those contractors was for Street Beat. 14 F.Supp.2d at 420 (finding economic dependence on defendant for work where it was undisputed that 75% of defendant's work was performed by contractors for which plaintiffs worked, and 85 to 95% of the contractors' work was for defendant). Thus, there is a genuine issue of material fact as to whether plaintiffs worked predominantly for and were economically dependent on defendants.[27]

■ Based on the analysis of the six factors set forth in *Liberty*, the Court concludes that there are genuine issues of material fact precluding summary judgment as to whether defendants were joint employers of plaintiffs for purposes of plaintiffs' FLSA and New York Labor Law claims. Accordingly, the court denies summary judgment as to those claims.

## II. *Individual Liability of Papouchado and Amar Under the FLSA*

■ Plaintiffs seek to impose liability under the FLSA on Papouchado and Amar by virtue of their operational control over Street Beat. Pl. Mem. at 30.[28] Defendants, on the contrary, argue that Papouchado and Amar cannot be held individually liable for any violations of the FLSA by Street Beat because the evidence does not establish that they had any operational control over the contractors that directly employed plaintiffs. *See* Def. Mem. at 26–28.

---

27. Both parties urge the Court to consider additional factors regarding whether defendants were the joint employers of plaintiffs. Plaintiffs argue that the increments in which defendants paid the contractors indicate a "subterfuge" between defendants and the contractors with respect to the tax laws. Pl. Opp. at 16. Defendants urge this Court to consider the fact that plaintiffs had opportunities to advance within the structures of the contracting shops and not in the business of Street Beat. Def. Opp. at 18. The Court declines to consider both points as they are irrelevant to a determination of a joint employment relationship between plaintiffs and Street Beat under *Liberty*.

28. Plaintiffs assert that the legal standard for imposing liability on Papouchado and Amar is the same under federal and New York labor law. *See* Pl. Mem. at 39–41 (citing *Patrowich v. Chemical Bank*, 63 N.Y.2d 541, 544, 483 N.Y.S.2d 659, 473 N.E.2d 11 (1984) (citing "economic reality" test of *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 14 (2d Cir.1984), regarding liability of corporate officer under § 194 of N.Y. Labor Law)). Defendants essentially concede that the same legal analysis applies by arguing, as they do with respect to the federal law analysis, that neither Papouchado nor Amar had operational control over the contractors. Def. Mem. at 32–33. Accordingly, the Court will analyze together the claims against Papouchado and Amar under both federal and New York law.

Plaintiffs urge the Court to apply the analysis of an "employer" under the FLSA set forth in *Herman,* 172 F.3d at 139. *Herman* involved the liability for FLSA violations of an officer of defendant corporation—the only remaining defendant at trial—as a joint employer. *Id.* at 138. *Herman* applied the test for joint employer liability adopted by the Second Circuit in *Carter,* which, as discussed above, was expanded by *Liberty. Id.* at 139. In *Herman,* defendant Portnoy was on the board of trustees of and owned a 50% stake in RSR, the corporation that hired plaintiff security guards, and had significant control over the daily operations of RSR, including that he hired individuals who managed the security guards, assigned guards to various locations, signed security guard payroll on several occasions and gave RSR executives instructions on how to run that company. *Id.* at 140. On those facts, the Court held that defendant was subject to individual liability for RSR's violations of the FLSA.

The court in *Lopez,* 14 F.Supp.2d at 412, considered the FLSA liability of both the defendant corporation, Renaissance, and its officer, Silverman, on the parties' cross-motions for summary judgment. It set forth a test for individual liability similar to that in *Herman.* According to that test, individual corporate officers or owners are deemed employers under the FLSA "in situations where the individual has overall operational control of the corporation, possesses an ownership interest in it, controls significant functions of the business, or determines the employees' salaries and

makes hiring decisions." [29] *Id.* The *Lopez* court analyzed the degree of operational control of Silverman over Renaissance, the company alleged to be the joint employer liable for FLSA violations. *Id.* at 412–13. The court held that Silverman could be held individually liable to the extent Renaissance was deemed to be an employer because, in addition to being the president and sole shareholder of Renaissance, Silverman operated the "marketing, designing and sketching [of] garments; made all of the company's business decisions; hired, fired, and set the salaries for its employees and negotiated with its contractors." *Id.* at 413. The court held that Silverman could be liable to the extent Renaissance was held liable "simply because he was a 'corporate officer who ha[d] operational control of the corporation's covered enterprise.' " *Id.* (quoting *U.S. Dep't of Labor v. Cole Enter., Inc.,* 62 F.3d 775, 778 (6th Cir.1995)). [30]

Unlike in *Herman,* the *Lopez* court analyzed the extent of the individual defendant's control over the putative joint employer, and not the extent of his control over the contractors that directly employed plaintiffs. 14 F.Supp.2d at 412. In this case, the evidence establishes, as plaintiffs argue, that Papouchado and Amar exercised operational control over Street Beat. *See* Pl. Mem. at 33. In addition to their relative responsibilities within that company which are discussed above, the evidence shows that Amar and Papouchado hired and fired employees of the sales department at Street Beat. Amar

---

29. Other courts in this circuit have adopted this language. *See Ansoumana,* 255 F.Supp.2d at 192 (citing *Lopez* language regarding individual liability of corporate officers for FLSA violations); *see also Bonner v. Guccione,* 1997 WL 362311, at *13 (S.D.N.Y. July 1, 1997) (applying test regarding determination of "employer" under Equal Pay Act, an amendment to the FLSA).

30. Defendants correctly point out that *Cole,* 62 F.3d at 778, involved one corporate entity, Echo Restaurant, which employed plaintiffs, and the liability of its president and 50% shareholder for alleged FLSA violations. Def. Mem. at 25. Thus, *Cole* is distinguishable from this case because Papouchado and Amar, through Street Beat, did not directly employ the plaintiffs.

Dep. at 81. Furthermore, they set the hours for the employees in the sales department at Street Beat, and Papouchado was responsible for setting the work schedule of Street Beat employees in the production department. *Id.* at 83, 84. Papouchado also set the wages for Street Beat employees in that department. *Id.* at 84.

While *Lopez* and *Herman* utilize substantially similar tests for individual liability, they apply those tests differently. One reason for this variation could be that the principal in *Herman* was a 50% shareholder of the company that directly hired plaintiffs.[31] That case, which plaintiffs urge the Court to follow here, is distinguishable from this case because the record does not establish such direct control by Papouchado and Amar over the contractors. Plaintiffs assert that Papouchado and Amar controlled all aspects of Street Beat's relationship with the contractors, *see* Pl. Mem. at 34, and are therefore liable as joint employers. Defendants, to the contrary, argue that there is no evidence to establish that Papouchado and Amar controlled the

contractors. Def. Mem. at 26. Even if the Court were to apply the *Herman* analysis, as expanded by *Liberty*, there are disputed questions of fact regarding the extent of Street Beat's and its individual officers' control over the contractors that employed plaintiffs. If this Court were to apply the *Lopez* analysis, then the individual defendants are liable to the extent that the corporation is liable, which, as discussed above, presents genuine issues of material fact.[32] Thus, the Court denies summary judgment as to the individual liability of Papouchado and Amar under the FLSA and New York Labor Law.

### III. *Negligence*

Plaintiffs assert three causes of action sounding in negligence against defendants,[33] namely, Negligent Supervision (Count Four), Negligent Hiring (Count Five), and Negligence *Per Se* (Count Six) for violation of "hot goods" provisions under state and federal law. Plaintiffs argue that Street Beat is liable for negligently failing to "exert due care in its hiring and monitoring of its subcontractors, even

---

**31.** At least one court in this circuit has cited *Herman* as "dealing with the question of whether the status of an employer under the FLSA could be attributed to a corporation's chairman of the board, *who held 50% ownership share in the company.*" *Lee v. ABC Carpet & Home,* 186 F.Supp.2d 447, 454 n. 8 (S.D.N.Y.2002) (emphasis added). Moreover, *Herman,* 172 F.3d at 140, relies on cases holding that a corporate officer's control over the corporation of which he is an executive member determines his individual liability for that corporation's FLSA violations. *See, e.g., Dole v. Elliott Travel & Tours, Inc.,* 942 F.2d 962, 966 (6th Cir.1991) (president and 100% shareholder of corporation had control over significant aspects of the corporation's daily functions so that he was properly subject to individual liability for the corporation's FLSA violations).

**32.** In their moving brief, defendants assert that "there is no legal precedent for holding

an individual officer or a jobber liable for wages of the employees of an outsourcing shop other than *Lopez v. Silverman,*" a case which defendants argue does not apply. Def. Mem. at 25. In their opposition brief, defendants urge the application of *Liberty* to determine the individual liability of Papouchado and Amar. Def. Opp. at 24. Absent authority applying *Liberty* to that issue, and because such application defies reason, the Court declines to do so.

**33.** Plaintiffs state that, although they pleaded negligence causes of action against Street Beat, Papouchado and Amar, they seek relief only against Street Beat as a "contractor" under these claims. *See* Pl. Mem. at 56 n. 8. Nevertheless, for purposes of these motions, the Court assumes that plaintiffs assert these claims against Street Beat, Papouchado and Amar as pleaded in the complaint.

though it had an obligation to do so under the circumstances." Pl. Mem. at 56. Therefore, plaintiffs argue, Street Beat can be held liable for the contractors' failure to make proper overtime and spread of hours payments to plaintiffs. *Id.*

■ Plaintiffs' negligence *per se* claim under 29 U.S.C. §§ 215(a)[34] and 217 and New York Labor Law § 345(10)[35] (referred to as "hot goods" provisions) warrants separate discussion. Plaintiffs allege that the defendants "transported, shipped and sold" garments that were produced for them by the contractors in violation of minimum wage and overtime requirements under federal and state law. *See* Compl. ¶¶ 66–70. Further, plaintiffs allege that they are among the class to be protected by the statutes. Plaintiffs allege that they have suffered injuries, including substandard wages and unduly long work hours, as a direct and proximate result of the defendants' transport, shipping and sale of those garments. *Id.* ¶ 70. In their memorandum of law, plaintiffs argue that defendants injured them by failing to ensure compliance with the "hot goods" provisions by not paying contractors enough to account for overtime pay.[36] Pl. Mem. at 60. To the extent that a statutory violation under a negligence *per se* theory provides some evidence of negligence,[37] the Court will analyze that claim together with plaintiffs' other negligence claims.

■ Defendants argue that plaintiffs' claims based on negligence are preempted by the FLSA and must be dismissed. *See* Def. Mem. at 34.[38] Plaintiffs argue that they plead the negligence claims in the alternative to their FLSA claims,[39] and that the claims will lie if the Court finds that Street Beat is not an "employer" un-

34. That provision makes it unlawful "(1) to transport, offer for transportation, ship, deliver, or sell in commerce, or to ship, deliver, or sell with knowledge that shipment or delivery or sale thereof in commerce is intended, any goods in the production of which any employee was employed in violation of section 206 or section 207 of this title". 29 U.S.C. § 215(a).

35. That provision states: "(a) Any manufacturer or contractor in the apparel industry who ships, delivers or sells any apparel or sections of apparel; who knew or should have known that such goods were produced in violation of article six or nineteen of this chapter, shall be deemed to have violated this article." N.Y. Labor Law § 345(10)(a). Curiously, the parties dispute the significance of N.Y. Labor Law § 345–a, but plaintiffs do not plead that section in their complaint.

36. Defendants' assertion that there is no private right of action under the "hot goods" provision of the FLSA in order to defeat plaintiffs' claim is unavailing. *See* Def. Mem. at 34, 36. At least one court has recognized that while there is no private right of action under the "hot goods" provision, a plaintiff could assert a negligence *per se* claim based on that provision. *See Bureerong v. Uvawas,* 959 F.Supp. 1231, 1236 (C.D.Cal.1997).

37. The law is well settled in New York "that where an ordinance for the protection or benefit of individuals prohibits the doing of acts or imposes a specific duty, the neglect to obey the prohibition or to perform the duty is some evidence of negligence to be considered by a jury in an action brought by one for whose protection the statute was enacted to recover for any injuries of the character which it was designed to prevent, proximately produced by such disobedience or neglect." *Carlock v. Westchester Lighting Co.,* 268 N.Y. 345, 349, 197 N.E. 306 (1935).

38. Defendants overstate the reach of this Court's decision in *Chen I* with regard to plaintiffs' negligence causes of action. In *Chen I,* the Court held that plaintiffs' claims were not preempted by the exclusivity provision of the Worker's Compensation Law. 226 F.Supp.2d at 361. The Court did not discuss preemption of plaintiffs' negligence claims under the FLSA.

39. The fact that plaintiffs did not plead their negligence claims in the complaint "in the alternative" does not require their dismissal if "it can be reasonably inferred that this is what [they were] doing." *G–I Holdings, Inc. v. Baron & Budd,* 238 F.Supp.2d 521, 536–37 (S.D.N.Y.2002).

der the FLSA. The law is unsettled as to whether the FLSA preempts state common law claims. Courts considering this issue analyze whether the FLSA and common law claims are grounded in the same facts.[40] The Court finds instructive *Petras v. Johnson*, 1993 WL 228014, at *3 (S.D.N.Y. June 22, 1993), in which the plaintiffs alleged "fraud on the ground that the defendants knowingly and with intent to misrepresent and deceive the plaintiff made false representations to him to lead him to believe that he was not entitled to overtime compensation." The court held that "defendants' alleged fraud lies simply in concealing plaintiff's rights under the FLSA" and that the FLSA provides the exclusive remedy for overtime payments. *Id. See also Alexander v. Vesta Ins. Group, Inc.*, 147 F.Supp.2d 1223, 1240–41 (N.D.Ala.2001) (granting summary judgment on plaintiffs' fraud claims based on alleged misrepresentations as to plaintiffs' overtime entitlement under the FLSA because the plaintiffs could not merely recast FLSA claims as common law claims to recover damages not available under the FLSA); *Johnston v. Davis Sec., Inc.*, 217 F.Supp.2d 1224, 1227–28 (D.Utah 2002) (finding that plaintiff's common law claims, including gross negligence and negligent misrepresentation, were preempted under the FLSA because they were based on the same facts and circumstances as her

FLSA claims, namely, overtime violations). *But see Paukstis v. Kenwood Golf & Country Club, Inc.*, 241 F.Supp.2d 551, 559–60 (D.Md.2003) (refusing to dismiss plaintiff's negligent supervision and negligence claims because there was no congressional intent to preempt them under the FLSA, nor did claims conflict with FLSA to the extent that plaintiff sought identical damages under state and federal law).[41]

According to the rationale of those cases, plaintiffs' allegations make clear that their negligence causes of action are founded upon the same facts as and therefore are duplicative of the FLSA claims. For example, in support of their argument, plaintiffs cite Street Beat's failure to pay the contractors amounts that were sufficient to account for overtime compensation for plaintiffs. Pl. Mem. at 60. Indeed, plaintiffs concede that their "negligence claims [are] based on violations of the" FLSA. *Id.* at 63. Accordingly, the Court grants summary judgment in favor of defendants as to plaintiffs' Fourth, Fifth and Sixth causes of action.

## IV. *Breach of the ACPA*

 In 1997, Street Beat entered into an Augmented Compliance Program Agreement ("ACPA") with the DOL. On the basis of that agreement, plaintiffs as-

---

**40.** The traditional preemption analysis inquires whether: (1) Congress intended to preempt state law; (2) Congress has regulated pervasively conduct in a field manifesting its intent to preempt state law; or (3) the state law conflicts with federal law. *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990). Plaintiffs only briefly argue that none of these is shown. They argue that in *Williamson v. Gen. Dynamics Corp.*, 208 F.3d 1144, 1151 (9th Cir.2000), the court found that the FLSA's "savings clause," 29 U.S.C. § 218(a), which provides that states may enact minimum wage laws that are more generous than the federal law,

was evidence that the FLSA does not preempt state law claims generally.

**41.** Plaintiffs cite *Williamson,* in support of their argument that "[t]he FLSA does not preempt tort claims that are not covered by its terms." That case is inapposite because it involved common law fraud claims based on an employer's representations to plaintiffs that they would retain their jobs. In reliance on those representations, the plaintiffs did not participate in the class action FLSA case. The court held that plaintiffs were never subject to the FLSA anti-retaliation provision and plaintiffs' claims did not duplicate the FLSA claims. 208 F.3d at 1152.

sert a breach of contract claim arguing that they are third-party beneficiaries. *See* Compl. Count Seven. In *Chen I*, this Court found that the ACPA was valid and binding, that it evidenced an intent to benefit the plaintiffs as third-party beneficiaries and that the benefit under the contract was sufficiently immediate to demonstrate an assumption between the parties of an obligation to compensate the plaintiffs if the benefit were lost. 226 F.Supp.2d at 362–66. Accordingly, the Court held that plaintiffs could enforce the agreement and denied defendants' motion to dismiss this claim. *Id.* at 366. Under the "law of the case" doctrine, the Court refuses to revisit this ruling. *Messinger v. Anderson,* 225 U.S. 436, 444, 32 S.Ct. 739, 56 L.Ed. 1152 (1912). Accordingly, the only issue here is whether defendants breached the ACPA and plaintiffs were denied the benefit of the agreement as a result.[42]

 Defendants raise several threshold issues to the Court's resolution of this claim. First, defendants argue that plaintiffs' cause of action is preempted by the FLSA. Def. Mem. at 37. Because defendants fail to support their assertion with any pertinent legal authority, and the Court's own research has found none, the Court rejects this contention. Second, defendants argue that the ACPA imposes preconditions to litigation, namely, that the DOL (1) provide Street Beat with notice in writing and (2) afford Street Beat the opportunity to meet and confer with the DOL regarding whether litigation is necessary or appropriate. *See* Def. Mem. at 39

(citing ACPA § 10(a), Kimerling Aff. Ex. 9). Defendants argue that failure to comply with this scheme bars plaintiffs' suit. In opposition, plaintiffs argue that this section of the ACPA does not impose a condition precedent to a suit by plaintiffs against Street Beat. Pl. Mem. at 54. Indeed, nothing in section 10 indicates that it applies to suits initiated by any entity or individual other than the DOL. It states, "While this ACPA is in effect, *the DOL will not initiate litigation* against the FIRM" (referring to Street Beat) before it initiates certain procedures. ACPA § 10(a) (emphasis added). Thus, the Court also rejects this challenge to plaintiffs' enforcement of the ACPA.

Plaintiffs assert their claim against "the Manufacturing Defendants," defined in the complaint to include Street Beat, Papouchado and Amar. Defendants argue that Papouchado and Amar cannot be subjected to individual liability under the contract because they were not signatories to it. Def. Mem. at 40–41. Plaintiffs do not oppose this argument. In support of their argument, defendants cite *Crabtree v. Tristar Auto. Group, Inc.,* 776 F.Supp. 155, 166 (S.D.N.Y.1991), in which the court dismissed a breach of contract claim against individual defendants (the principals of defendant corporation) based on the rule of law that "a non-signatory to a contract cannot be named as a defendant in a breach of contract action unless it has thereafter assumed or been assigned to the contract." *See also Blank v. Noumair,* 239 A.D.2d 534, 658 N.Y.S.2d 88 (2d Dep't 1997). The ACPA itself does not

---

42. Because the Court adheres to its earlier ruling that plaintiffs were the intended beneficiaries of the ACPA, the purpose of which was "to ensure that factories hired by Street Beat for the production of its garments pay their employees minimum wage and overtime," 226 F.Supp.2d at 363, it does not address defendants' contention that the sole purpose of the ACPA was to enforce the "hot goods" provision of the FLSA. *See* Def. Mem. at 37–39. In any event, testimony obtained in discovery supports the view that the ACPA was intended to ensure that workers such as plaintiffs received minimum wage and overtime. *See* Amar Dep. at 62–63.

indicate that Papouchado and Amar were signatories to it; rather, its text indicates that the DOL and "the FIRM," which "means the firm executing this ACPA" or Street Beat, entered into the agreement. *See* ACPA § 2(I). Moreover, the Memorandum of Agreement ("MOA"), *see* Compl. Ex. A, indicates that Papouchado signed as the "Duly–Authorized Agent" of Street Beat. Accordingly, since there is no evidence that Papouchado and Amar were signatories to the ACPA in their individual capacities, the Court dismisses Count Seven as to those two defendants.

The issue before the Court is whether Street Beat breached the terms of the ACPA. In the complaint, plaintiffs allege that, pursuant to the ACPA, Street Beat is obligated to: (1) undertake pre-contract evaluations of the economic feasibility, based on the price of a job, of a contractor's compliance with the FLSA; (2) monitor contractor compliance with the FLSA; and (3) suspend shipment of any goods when it detects a violation of the FLSA by a contractor and pay any unpaid back wages. *See* Compl. ¶ 31. Plaintiffs assert that Street Beat breached the ACPA by failing to satisfy those obligations.

## A. Economic Feasibility of Contractors' Compliance

The ACPA requires Street Beat to review the Employer Compliance Program ("ECP"), attachment No. 1 to the ACPA, with each contractor with which it enters into an agreement before that agreement is consummated. *See* ACPA § 3(a). Section 3 of the ACPA also requires Street Beat to review the "economic feasibility of the price terms that are involved, in light of the compliance with the [FLSA] and the ECP required of the Contractor and in

light of the calculations and expectations of the parties to the purchase." *Id.* § 3(a)(iii). Under that provision, Street Beat is also obligated to document the topics covered by the review with each contractor as to compliance with the ACPA and calculations of price. *Id.* § 3(a).

It is undisputed that contractor owners signed ECPs acknowledging their awareness of and commitment to comply with the labor regulations imposed by the ACPA.[43] Moreover, Street Beat instructed the contractors' accountants on proper payroll methods. Def. 56.1 Statement ¶ 180. Smith testified that he conducted two meetings with contractor owners regarding compliance with the labor laws and that he "prepared a schedule that taught each owner how to properly calculate the piece rate and how to take into account overtime." Smith Decl. ¶ 16.

Plaintiffs argue that Street Beat breached section 3 by failing to consider whether the prices it paid contractors were sufficient to cover overtime payments to plaintiffs. Pl. Mem. at 43. Pricing garment jobs was the responsibility of Papouchado. *See* Papouchado Decl. (Aug. 25, 2004) ¶ 10. Papouchado admitted at his deposition that he did not take into account overtime payments in determining the price of a garment job for a contractor. *See* Papouchado Dep. at 141. Moreover Papouchado testified that on occasion contractor representatives told him that because the payments from Street Beat were not sufficient, they had to use their own money to cover costs. *Id.* at 65; Pl. Reply 56.1 Statement ¶ 149. Defendants dispute that Street Beat was aware of any complaints by workers. Def. 56.1 Statement ¶ 149.

---

43. Contractors that contracted with Street Beat signed forms acknowledging their commitment to comply with the labor laws. *See* Pearl Aff. Ex. F (Pre–Contract Screening Form signed by Chen Xing Mei) at 3. Street Beat required that the contractors complete the form within one week of starting a job for the company. Def. 56.1 Statement ¶ 183.

Smith testified that he was not aware of any payroll problems within the contractors and that Street Beat was under no obligation to investigate payroll problems. *See* Smith Dep. at 63.

Furthermore, Smith testified that he did not perform any studies with regard to contractors' ability to pay minimum wage to workers. *See id.* at 72–73. Thus, the evidence shows that, although Street Beat reviewed ECP requirements with contractor owners, it failed to perform or document any economic feasibility evaluations, including accounting for overtime compensation for plaintiffs in the prices it offered contractors.[44]

## B. Written Purchase Agreements

Plaintiffs next argue that Street Beat violated the ACPA by failing to reduce contracts with contractors to a writing as required by section 4(a) ("the purchase will be in writing"). The evidence shows that, at least with respect to Red Arrow, there were no written contracts between Street Beat and the contractors. *See* Fan Dep. at 129. No other evidence presented to the Court indicates that Street Beat entered into written purchase agreements with the contractors.

## C. Monitoring and Enforcement

The ACPA also requires Street Beat to "monitor and enforce full compliance with the [FLSA] and the ECP by all contractors in all activities connected with any purchase by [Street Beat], by using all reasonable measures." *See* ACPA § 4(d). That includes compliance with the "hot goods" provision of the FLSA and the ECP. The ACPA requires contractors to have certain posters and record the number of hours their employees worked. Def. 56.1 Statement ¶ 212. That agreement further requires Street Beat to submit semiannual reports to the DOL regarding its monitoring activities and findings. ACPA § 5(g). The ECP, in turn, requires, among other things, contractors to comply with the minimum wage and overtime provisions of the FLSA and to keep records of wages and hours. *See* ECP §§ 6, 7.

Smith, as the CFO of Street Beat, was involved in monitoring the compliance of the contractors with the section of the ACPA concerning "hot goods." Def. 56.1 Statement ¶ 171. Since 1997, Smith visited approximately seven contractors. *Id.* ¶ 172. Papouchado was aware that monitoring contractors' compliance with the labor laws was required under the ACPA. *See* Papouchado Dep. at 150. Street Beat had quality control staff who mostly ensured the quality of the sewing by contractors, but also spent a "small percentage" of their time monitoring the contractors that sewed garments for Street Beat. *Id.* ¶¶ 150, 164. *See also* Smith Decl. ¶ 18 (quality control staff spent about 5% of their time at the factories monitoring compliance with the FLSA "hot goods" provision). One quality control staff person was Helen Cheung.[45] Cheung visited the contractors' factories, monitoring the quality of the work and time of delivery. Def. 56.1 Statement ¶ 152. Cheung testified that she generally spent between one half hour to two hours at each factory she

---

44. Plaintiffs argue that Street Beat failed to make "retroactive adjustments" to the prices paid to contractors when those prices were insufficient for contractors to cover their costs and make a profit. Pl. Mem. at 44. The ACPA does not require Street Beat to make such retroactive adjustments.

45. Plaintiffs contend that Helen Cheung was the only quality control employee identified by defendants. Pl. Reply 56.1 Statement ¶ 206. Although Papouchado and Smith claim that Ai Ling ("Eileen") Mui was a quality control employee or compliance monitor, *see* Smith Dep. at 27–28, she certifies that she never held that position. *See* Mui Cert. ¶ 18.

visited between the hours of 9 a.m. and 5 p.m. Monday through Friday. *See* Cheung Dep. at 21. Generally, the visits of the quality control personnel were random, as opposed to regularly scheduled, and unannounced. Def. 56.1 Statement ¶ 153. Cheung visited the contractors to monitor compliance with the ACPA either once every three months or once every six months. *See* Cheung Dep. at 18. Additionally, Street Beat utilized a company called ARI[46] which made "surprise visits" to contractors to monitor compliance with the ACPA. Def. 56.1 Statement ¶ 177. Street Beat later terminated that relationship because it decided more vigorous monitoring was needed. *Id.* ¶ 179. *See also* Papouchado Decl. (Aug. 25, 2004) ¶ 32.

Street Beat compared the contractors' employee time cards with payroll records and made surprise visits to the factories to ensure that the number of employees matched the number of people who punched time cards. Def. 56.1 Statement ¶ 211. On those visits, the quality control persons interviewed three to four employees to determine if they were being paid minimum wage and overtime. Smith Decl. ¶ 19. The quality control staff monitored the paychecks and timesheets of the contractors, collected records and spoke to their accountants. Papouchado Decl. (Aug. 25, 2004) ¶ 33. Smith instructed the quality control employees to ask the owners or supervisors "if they paid on time and if they paid the minimum wage." Def. 56.1 Statement ¶ 201. That staff would report any violations to Smith and notify the contractors as to any mistake in payroll. *See* Smith Decl. ¶¶ 22, 24. Smith testified that Street Beat's compliance investigations never showed any violations of the FLSA. *Id.* ¶ 26.

Plaintiffs argue that Cheung's monitoring efforts were inadequate under the ACPA. First, they argue that Smith poorly supervised Cheung. Pl. Mem. at 47. Smith only accompanied Cheung on one quality control visit. Pl. Reply 56.1 Statement ¶ 200. Second, plaintiffs challenge Street Beat's investigation of the contractors. Street Beat issued "Questionnaires" to contractors and "periodically reviewed" them. *See* Smith Decl. ¶ 9; *see also* Kimerling Decl. Ex. 13 (attaching "Worker Questionnaire"). Smith rarely reviewed the compliance questionnaires himself; instead, Cheung reviewed the forms. Def. 56.1 Statement ¶ 203. Plaintiffs argue that there were "facial inconsistencies" in Cheung's reports that should have raised doubts about contractors' compliance. For example, Papouchado testified that statements on those reports sometimes showed that an employee worked each weekday from 8 a.m. to 8 p.m., but also indicated that the employee worked forty hours that week. Papouchado Dep. at 221; *see also* Kimerling Decl. Ex. 13. Regarding this discrepancy, Smith testified that the start and end times did not take into account actual numbers of hours worked during the day minus break time. *See* Smith Dep. at 77–78. Additionally, Smith testified that certain questionnaires showed total wages for a forty hour work week that meant the employee was being compensated below minimum wage. He concluded that the workers must have been paid in cash for amounts above the earnings listed in order to reach minimum wage and overtime. *See* Smith Dep. at 35–36. Cheung's deposition testimony corroborated this. She testified that the wages paid by check were less than minimum wage for the hours worked, but that contractors made

---

**46.** It is not clear precisely when Street Beat used ARI to monitor compliance with the ACPA. Papouchado stated that Street Beat used ARI during the period from "1996 to 1999." The evidence shows that ARI issued reports on Covello and XMG on December 9, 1998. *See* Kimerling Decl. Ex. 10.

up the difference by paying the workers in cash. *See* Cheung Dep. at 66–69. Cheung interviewed employees about their "piece cards" (which reflected their pay) and never found an inconsistency between the hours worked as indicated on the cards and salary. *Id.* at 54–55.

Plaintiffs argue that Smith and Cheung were aware of the inaccuracies of these reports, but did nothing to remedy them. Pl. Mem. at 49. Indeed, Street Beat was under an obligation to report accurately the wages and hours of the plaintiffs. Additionally, the ECP prohibits payment of wages in cash or by any other means than payroll check. ECP § 8(d). Street Beat, through Cheung and Smith, knew that the contractors were paying plaintiffs in both cash and check, and yet failed to enforce section 8(d) of the ECP.

With regard to enforcing compliance, the DOL went to the offices of Street Beat to discuss the labor laws with owners of contractors doing business with Street Beat. Def. 56.1 Statement ¶ 175. *See also* Amar Dep. at 58. Liang was present, along with other contractor owners, at one meeting at Street Beat where the company explained the requirements of the ACPA, including that he had to pay employees minimum wage and overtime. Def. 56.1 Statement ¶¶ 176, 187, 188, 213. Liang signed a form attached to the ACPA which he understood to mean that he had to comply with that agreement. *Id.* ¶ 186. Defendant Fan was also present at a meeting conducted by Street Beat regarding compliance with the labor laws. Plaintiffs dispute the effectiveness of that meeting based on Fan's testimony that it was conducted in English and he did not understand what was being said, other than that the general topic was the labor laws. *See* Fan. Dep. at 139–141.[47]

The evidence shows that Street Beat failed to meet its obligation to "monitor and ensure" the contractors' compliance with the FLSA. In particular, that Cheung and Smith believed cash payments adequately compensated plaintiffs as required under the FLSA does not rectify their failure to investigate the inaccuracies in the employee questionnaires, especially because the ACPA specifically prohibits cash payments. Moreover, there is no evidence that Street Beat submitted semiannual reports to the DOL regarding its monitoring activities and findings as required under § 5(g) of the ACPA.[48]

Based on the above, the Court concludes that Street Beat breached the ACPA and grants summary judgment in

47. Defendants claim that the meetings were translated from English to Chinese and Spanish. They refer to a portion of Amar's deposition in which he testified that "a Chinese person, a Spanish person" were present at the DOL meetings. Amar Dep. at 58. That testimony does not establish that the meetings were translated.

48. Plaintiffs contend that the ACPA also requires Street Beat to pay back wages to employees of contractors that have failed to pay minimum wage and overtime to their workers. Pl. Reply 56.1 Statement ¶ 173; *see also* Def. 56.1 Statement ¶ 212. The ACPA requires Street Beat to "make payments to the DOL in an amount sufficient to enable the DOL to allocate and disburse monies to the employees of Contractors ... in amounts sufficient to compensate the employees for back wages due to them under the Act from the Contractor." ACPA § 8(a). In *Chen I*, this Court described the import of section 8(a). Specifically, I found that Street Beat entered into the MOA in part to resolve prior complaints by Monami and Excel Fashions as to wage and hour violations. 226 F.Supp.2d at 364. Section 8(a)(I) of the ACPA applies to those two contractors, requiring Street Beat to pay back wages, because violations had been found prior to the ACPA. *Id.* The Court does not read this section of the ACPA to require Street Beat to pay back wages to employees of contractors that the DOL has not found to violate the FLSA. Therefore, the Court rejects plaintiffs' argument.

favor of plaintiffs on this claim.[49] Finally, defendants argue that plaintiffs' breach of contract claim is subject to the two- or three-year statute of limitations under the FLSA for unpaid minimum wage and overtime compensation. Def. Opp. at 46. They cite no authority for the proposition that the claims of third-party beneficiaries to a contract are subject to a different limitations period than those of a party to that agreement. Accordingly, plaintiffs' claim for breach of contract was timely filed under the six-year statute of limitations period set forth in N.Y. C.P.L.R. § 213.

## CONCLUSION

For the foregoing reasons, the Court: (1) denies summary judgment as to plaintiffs' FLSA and New York Labor Law claims (counts One, Two and Three); (2) grants summary judgment in favor of defendants as to the negligence claims (counts Four, Five and Six); (3) grants summary judgment in favor of defendants Papouchado and Amar in their individual capacities as to Count Seven for breach of contract; and (4) grants summary judgment in favor of plaintiffs as to Count Seven regarding Street Beat's liability for breach of contract.[50]

SO ORDERED.

---

**49.** Neither party briefs the issue of, and there is insufficient evidence regarding, Street Beat's compliance with section 15 of the FLSA, requiring it to suspend shipment of any goods when it detected a violation of the FLSA by a contractor. *See* Compl. ¶ 31.

**50.** Given the Court's disposition of these motions, it declines to address plaintiffs' motion for summary judgment on the amount of their damages or whether they are entitled to liquidated damages under their FLSA and N.Y. Labor Law claims. *See* Pl. Mem. at 65.